**Mary Jean MARTIN, et al., and John R. Fischer, et al., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 85–2077, 85–2088.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1986.

Decided Feb. 3, 1986.

Edward W. Johnson, Johnson, Carroll & Griffith, Jack Van Stone, Van Stone & Krochta, Evansville, Ind., for petitioners-appellants.

Gayle P. Miller, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, and BAUER and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Seven heirs to a family farm appeal from a decision of the Tax Court denying the preferential treatment that 26 U.S.C. § 2032A, which was added in 1976, provides with regard to valuing the real estate of such farms for purposes of federal estate taxation. 84 T.C. 620 (1985). The

decedent (we simplify the facts a bit) owned and operated a 209-acre farm in Indiana of which 166 acres were used for growing crops. Toward the end of his life the farm was operated by one of his sons-in-law under a sharecropping arrangement. The decedent died in 1978 and the farm passed to the seven heirs, one of whom was designated the personal representative of the estate and that year filed an estate tax return showing a total estate tax due of $11,000. But for section 2032A, the tax would have been $95,000. In 1979 the personal representative decided to terminate the sharecropping arrangement and lease the farm to the highest bidder for one year on a pure cash basis. This was done, and the farm was leased to a company for $21,060. A state court approved the lease over the objection of two of the heirs, who feared just what has happened—that the lease would result in a loss of the estate tax break. During the term of the lease some of the heirs assisted the lessee by clearing land, filing in holes, and providing general advice. When the lease expired, the farm was partitioned into two parts. The larger part remained on lease to the former lessee but on a sharecropping rather than straight cash basis; the smaller is being operated by one of the heirs.

The estate qualified for preferential treatment when the estate tax return was filed, but subsection (c), the recapture provision, entitles the government to levy an additional tax if the heir ceases to use the property "for the qualified use." 26 U.S.C. § 2032A(c)(1)(B). Such cessation occurs either if the *property* ceases to be used for the qualified use or if, for three or more years during an eight-year period, the *heir* does not materially participate in the qualified use. §§ 2032A(c)(6)(A), (B). Only the first of these disqualifying events is alleged here. The statute defines "qualified use" as "the devotion of the property to any of the following: (A) use as a farm for farming purposes, or (B) use in a trade or business other than the trade or business of farming." § 2032A(b)(2). The issue is whether by making a cash lease of the farm for one year the heirs ceased putting the farm to a qualified use; if they did, the Tax Court correctly decided that they owe more tax.

Read literally, the statute provides some support for the taxpayers' position. The farm was being used for farming purposes even when it was leased for a fixed sum for one year; and the government does not deny that during that year the heirs materially participated in the lessee's operation—and anyway it is only when there are three or more years without material participation that the preferential tax treatment is forfeited. But the purpose and structure of the statute, some of its language, its legislative history, and the Treasury Department's pertinent regulation all support the Tax Court.

The purpose of the statute was to encourage the continuation of family farms after the death of the farm's owner. See, e.g., H.R.Rep. No. 1380, 94th Cong., 2d Sess. 21–22 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3375; *Estate of Cowser v. Commissioner*, 736 F.2d 1168, 1170 (7th Cir.1984). (The statute is not limited to farms; it extends to all small closely held businesses; but the benefit it confers—allowing real estate to be valued below its market value—is important chiefly to farms, and we have found only one reported case that did not involve a farm or ranch, *Estate of Trueman v. United States*, 6 Cl.Ct. 380 (1984).) That purpose will not be achieved if, as the taxpayers' argument implies, heirs are free to lease the entire farm on a fixed-price basis to an agribusiness or any other farmer indefinitely, provided only that the heirs (or one of them) continue to participate materially in the operation of the farm during some—not all—of the eight years following the owner's death. It is true that material participation may not be so easy a requirement to satisfy as the parties have assumed in this case. See *Estate of Coon v. Commissioner*, 81 T.C. 602, 608–11 (1983). But it would of course be satisfied if the heirs went to work as full-time farm laborers for the lessee; and yet that would hardly illustrate the preservation of the

family farm; it would, indeed, be something quite nearly the opposite. And even that would not be required in every year.

The reading for which the taxpayers contend would go far toward limiting the recapture tax to cases where there was no material participation for three or more years, whereas Congress provided that the tax would also be levied if there was a cessation of qualified use. All *that* means, the taxpayers argue, is that to avoid the tax the farm must continue in farming. We disagree. When the estate tax return was filed, the heirs were operating the farm through a sharecropping arrangement with one of them; that was the qualifying use and it ceased when the farm was let at a fixed rental. The House Report minces no words: "The mere passive rental of property will not qualify." H.R.Rep. No. 1380, *supra*, at 23, U.S.Code Cong. & Admin.News 1976, p. 3377. The taxpayers say this sentence refers to the requirement of material participation, but the section from which it is taken is captioned "Qualifying real property," and the sentence follows directly and in explanation of the statutory definition of qualified use, i.e., use as a farm or other trade or business. Material participation is discussed separately. See *id.* at 22–23 and n. 1, 27. The injunction against passive uses is repeated in the legislative history of some technical amendments made to the statute in 1981 with retroactive effect, so that they apply to the present case. See H.R.Rep. No. 201, 97th Cong., 1st Sess. 169 (1981) ("the bill does not change the present law requirement that this use be an active trade or business use as opposed to a passive, or investment, use"); S.Rep. No. 144, 97th Cong., 1st Sess. 133 (1981) (same), U.S.Code Cong. & Admin.News 1981, pp. 105, 233. Given the retroactivity of the amendments, we do not think these committee reports should be considered postenactment legislative history, the pitfalls of which we discussed in *In re Tarnow*, 749 F.2d 464, 467 (7th Cir. 1984). As for the general danger that a committee report might not reflect the understanding of a majority of the members of Congress—might, indeed, not even

be known to them, *Hirschey v. FERC*, 777 F.2d 1, 7–8 (D.C.Cir.1985) (concurring opinion)—it is enough to say that we do not rest our decision entirely on the legislative history, nor use it to reach a result inconsistent with the language of the statute and with the purpose that can be inferred from that language without recourse to legislative history.

The amendments made in 1981 have a further significance in this case. The original definition of "qualified real property," which is to say the property that qualifies for preferential tax treatment, was (so far as pertinent here) property that on the date of the decedent's death "was being used for a qualified use." 26 U.S.C. § 2032A(b)(1). In 1981 the words "by the decedent or a member of the decedent's family" were added. These words do not appear in the recapture provision. We are asked to infer that all that is required to avoid recapture is that the property continue in a qualified use; the use need not be by the heir. But this interpretation is almost certainly wrong. The apparent purpose of adding the quoted words, and the purpose that the legislative history confirms, was to make clear that the decedent himself didn't have to be working the property at the date of his death, see H.R.Rep. No. 201, *supra*, at 169; S.Rep. No. 144, *supra*, at 133, U.S.Code Cong. & Admin. News 1981, p. 233; for if, as would usually be the case, he died after an illness, he would be quite likely to have quit working the property a substantial time before his death. It was enough that a member of the family carried on when he got ill, and was operating the farm when he died.

Thus, far from supporting the taxpayers' position on recapture, the amendment reinforces the government's position that the qualified use must be active rather than passive; for, if passive were good enough, there would have been no reason to amend the statute to make clear that the decedent himself did not have to be working the farm at the time of this death. As the Senate Report explains, one effect of the amendment is that "if a decedent has leased otherwise qualified real

property to a son pursuant to a net cash lease, and the son conducts a farming operation on the property, the son's business use is attributed under the bill to the decedent.... On the other hand, during any period when the decedent leases the real property to a nonfamily member for use in a qualified use *pursuant to a lease under which the rental is not substantially dependent upon production,* the qualified use requirement is not satisfied." (Footnote omitted and emphasis added.) In other words, a net case lease to a stranger, as in this case, works a forfeiture of the preferential tax treatment that the statute allows.

■ We must give substantial weight to the pertinent Treasury Regulation, 26 C.F.R. § 20.2032A–3, even though in this case it is interpreting language defined by the statute rather than making a substantive rule under an express authorization from Congress to do so. See *Rowan Cos. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981). The regulation follows the committee reports in stating that "the mere passive rental of property to a party other than a member of the decedent's family will not qualify." 26 C.F.R. § 20.2032A–3(b)(1). It is true that the regulation is captioned "Material participation requirements for valuation of certain farm and closely-held business real property," but the scope is broader. Subsection (b), captioned "Types of qualified property," deals with the anterior issue whether there is a qualified use (qualified property is defined as we have seen in terms of qualified use), and that is the subsection which contains the passage about passive uses.

■ The taxpayers leased the farm on a net cash basis. This made them passive investors for the duration of the lease (which might, as we have said, have been for an indefinite period without affecting the taxpayers' argument). Whether farm prices rose or fell, whether the crops planted on the farm flourished or were wiped out by cold weather or disease, whether in short the farm was productive or unproductive, profitable or unprofitable, the taxpayers' rental income would be unaffected.

They were thus out of the farming business, and outside the scope of the statute.

The government concedes that if the lease had been on a sharecropping basis so that part of the risk of the farming remained on the heirs rather than being totally shifted to the lessee, the case would be different. We need not speculate on what other types of risk-sharing arrangements besides sharecropping might avoid forfeiture. These heirs were rentiers, not farmers, during the period of the lease, and they thereby forfeited the exceptionally favorable tax treatment that the statute provides to those who come within its demanding terms—as the Eleventh Circuit has also held. *Estate of Sherrod v. Commissioner,* 774 F.2d 1057, 1064–65 (11th Cir.1985).

We can do nothing for the two heirs who opposed the lease. In any case of divided ownership there is a potential for disagreement and disappointment. A majority of the heirs apparently believed that the lease represented a calculated risk that was on balance advantageous. Perhaps ex ante it was. The only recourse the dissenting heirs had was to try to persuade the state court that the majority was underrating the tax risks. They failed and, we are very sorry to say, must take the consequences.

AFFIRMED.