**Timothy S. HEFFLEY, as Executor of the Estate of Opal P. Heffley, deceased, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 88–1929.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1989.

Decided Aug. 17, 1989.

Stephen J. Williams, Shambaugh, Kast, Beck & Williams, Fort Wayne, Ind., for petitioner.

Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., Dept. of Justice, Tax Div., Appellate Section, William F. Nelson, I.R.S., David E. Carmack, David M. Moore, Dept. of Justice, Tax Div., Washington, D.C., Ross E. Springer, Indianapolis, Ind., for respondent.

Before POSNER, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

Opal P. Heffley died in 1981. Her estate claimed the right to value under the special use valuation provisions of 26 U.S.C. § 2032A a farm in which Opal had held an interest. The Commissioner of Internal Revenue disagreed, and assessed a federal estate tax deficiency. The Tax Court determined that the property had not been put to a statutorily qualified use. We affirm.

## I.

## FACTS

### History of the farm

Opal P. Heffley died on September 23, 1981 at age 67. Her son Timothy Heffley is the duly appointed, qualified and acting executor of her estate.

Opal Heffley's estate included a farm containing 280 acres of tillable land which Opal and her husband Max Heffley owned as tenants by the entirety. Max died on May 26, 1972. During spring 1972 Opal assumed management and arranged for Max's brother Wayne Heffley to farm the land. On October 24, 1976, Opal and Wayne entered a farm rental contract under which Wayne, as tenant, agreed to pay Opal an annual cash rent of $10,011.80. They continued to operate under the lease for the years 1977–1980 inclusive.

By warranty deed recorded on September 26, 1978, Opal conveyed title to the farm to Timothy as trustee. Timothy continued to hold title to the farm as trustee from that date until Opal's death on September 23, 1981. Under the terms of Opal's April 23, 1981, revocable trust agreement, the title to the farm would be transferred to Timothy upon her death.

### Participation by Timothy Heffley

Timothy worked on the farm from the mid–1970's until 1981. Timothy testified that his farm work prior to 1981 was not labor required by the land rental contract between his mother and Wayne Heffley, but that Wayne paid him for his services. During each of the four academic years beginning in September 1976, Timothy was a full-time student at Indiana University in Bloomington, Indiana, where he lived. During academic year 1980–81, Timothy attended and graduated from Indiana University at its Fort Wayne, Indiana, regional campus, and lived on Opal's farm.

On February 11, 1981, Timothy, as trustee of Opal's trust, rented 186 tillable acres to his cousin, Jerry Heffley. Jerry's rent

included a combination of cash and grain. The trust had no obligations under this arrangement other than providing the land and applying limestone to the soil if necessary. During 1981, prior to his mother's death, Timothy raised approximately 15 acres of beans and planted about three acres of trees on the farm (on acreage not leased to Jerry), but he paid no rent to the trust for the use of this real estate.

*Tax filings and treatment by Opal and Timothy*

In her 1973 federal income tax return Opal used Form 4835 to report farm rental income based on crops or livestock produced by a tenant, where a landowner does not materially participate in operating or managing the farm. For 1974–1980 inclusive, Opal reported the farm income as rent. Opal paid no self-employment tax upon her farm income for the years 1973–1980 inclusive.

In the estate tax return, Timothy, as executor, elected to value the real estate pursuant to the provisions of § 2032A.[1] The estate and the IRS agree that the fair market value of the farm on the date of Opal's death was $463,000. They also agree that the special valuation of this real

estate is the special use value of $90,-339.50.[2]

Timothy reported that the special use value based upon the average gross cash rental for comparable farmland was $90,-339.50, and he reported a total gross estate of $110,450.92 with no federal estate tax liability. He made no election under § 6166A,[3] nor protective election under Treasury Regulation, 26 C.F.R. § 20.6166–1(d),[4] to pay in installments any of the federal estate tax due upon the return. Through a notice of November 13, 1984, the Commissioner determined that the estate did not qualify for special use valuation under § 2032A. Because the Commissioner determined that the farm had not qualified, he included the farm in the gross estate at its fair market value and identified a deficiency of $84,373.47 in estate tax.

## II.

### A. *Tax Court Proceedings*

In the Tax Court, the issues were (1) whether Timothy S. Heffley as executor of Opal's estate is entitled to value the farm by the special use valuation provisions of § 2032A; and (2) pursuant to petitioner's

---

1. 26 U.S.C. § 2032A(a) provided in the case of decedents dying in 1981 where the estate held qualified real property valued less than $600,-000:

    (1) *General Rule.*—If—
    (A) the decedent was (at the time of his death) a citizen or resident of the United States, and
    (B) the executor elects the application of this section and files the agreement referred to in subsection (d)(2),
    then, for purposes of this chapter, the value of qualified real property shall be its value for the use under which it qualifies, under subsection (b), as qualified real property.

2. As the Tax Court recognized, under earlier law property wherein a decedent held an interest at death generally was included within the decedent's gross estate at its fair market value as determined by reference to its highest and best use. But 26 U.S.C. § 2032A resulted from Congressional concern over the unfortunate tax consequences produced from valuing real property put to small business uses at its highest and best use rather than at its then-existing family use. Section 2032A(e)(7) now permits an executor to value certain qualified real property

through using an income capitalization means of valuation, rather than the traditional fair market value premised upon the highest and best use.

3. The former 26 U.S.C. § 6166A(a) [repealed August 13, 1981] provided

    If the value of an interest in a closely-held business which is included in determining the gross estate of a decedent who was (at the date of his death) a citizen or resident of the United States exceeds either—
    (1) 35 percent of the value of the gross estate of such decedent, or
    (2) 50 percent of the taxable estate of such decedent,
    the executor may elect to pay part or all of the tax imposed by section 2001 in two or more (but not exceeding 10) equal installments ...

4. 26 C.F.R. § 20.6166–1(d) provides: "A protective election may be made to defer payment of any portion of tax remaining unpaid at the time values are finally determined (or agreed to following examination of a return) and any deficiencies attributable to the closely-held business interest ..."

amended petition with the Tax Court of September 30, 1985, whether the petitioner is entitled to pay interest upon any deficiency in the estate tax at the reduced rate provided in § 6601(j).

The specific dispute in the Tax Court centered on whether the farm, when owned by Opal and operated by Timothy as Trustee, met the "qualified use" requirement of § 2032A(b)(1)(C)(i) and the "material participation" requirement of § 2032A(b)(1)(C)(ii). The Tax Court concluded that the farm real estate had not been put to such a qualified use. It also determined that neither Opal nor a member of her family had materially participated in operating the farm. The Tax Court also held that Opal's estate was not entitled at this time to make an election under § 6166(a), which would have permitted the estate to pay the estate tax by installments. An estate's eligibility to pay at the reduced rate provided in § 6601(j) depends on whether it is entitled to pay a portion of the deficiency in installments under § 6166, which in turn depends upon its executor making a valid election or protective timely election for installment payments. No such timely election having been made here, the Tax Court found itself without jurisdiction to compute the interest payable on the deficiency.

### B. Standard of Review

Tax Court legal conclusions receive plenary review upon appeal. We reverse the Tax Court's factual findings only when they are clearly erroneous. Estate of Arthur S. Kraus v. Commissioner, 875 F.2d 597, 599 (7th Cir.1989); Eli Lilly & Co. v. Commissioner, 856 F.2d 855, 861 (7th Cir. 1988). We review mixed questions of fact and law, applying a legal principle to a specific factual pattern as here, under the clearly erroneous standard of review. Eli Lilly & Co., 856 F.2d at 861; Schuneman v. U.S., 783 F.2d 694, 699 (7th Cir.1986).

### III.

### ANALYSIS

### A. Background and Purpose of the Statute

Section 2032A of the Internal Revenue Code originally was enacted as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520, 1856. Schuneman, 783 F.2d at 697. As initially enacted, § 2032A(b)(1)(A)(i) required that the property on the date of the decedent's death be used for a qualified use. But § 421(B)(1) of the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172, 306, amended § 2032A(b)(1) to require that the property on the date of decedent's death be used for qualified use "by the decedent or a member of the decedent's family." The 1981 legislation made this amendment retroactively effective to the estates of decedents dying after December 31, 1976. Id. at 698.

The purpose of § 2032A was to encourage the continuation of family farms after the death of a farm's owner. While the statute applies to other small businesses, the benefit it confers (allowing real estate to be valued below its market value) is chiefly important to farms. Martin v. Commissioner, 783 F.2d 81, 82 (7th Cir. 1986). The congressional purpose underlying today's statutory language is to make clear that the decedent himself did not have to be working the property at the date of his death. If, as typically is so, the decedent died following an illness, he would be quite likely to have quit working the property a substantial time before he died. As long as a member of the family had continued the farming operation when the decedent became ill, he would be considered to have been operating the farm when the decedent died. Id. at 83.

The federal estate tax on real property normally is determined through valuing the property at its highest and best use at or near the date of death. To pay estate taxes, those who inherited family farms frequently had to sell their newly-inherited property. Estate of Cowser v. Commissioner, 736 F.2d 1168, 1170 (7th Cir.1984). This occurred because the real property, in effect, was valued separately and apart from the ongoing farm enterprise. Estate of Coon v. Commissioner, 81 T.C. 602, 607 (1983), citing D. Kelly & D. Ludtke, Estate

*Planning for Farmers and Ranchers*, 642–43 (1980).

Consequently, under § 2032A certain real property used in family farming is valued on the basis of the property's actual use at the time of the decedent's death, rather than on the basis of the highest and best use—that which a willing buyer, perhaps a developer, would pay. *Cowser*, 736 F.2d at 1170. Thus, the congressional purpose of § 2032A is to avoid forced liquidation of working family farms in order to pay a substantial estate tax. *Estate of Sherrod v. Commissioner*, 774 F.2d 1057, 1061–62 (11th Cir.1985). When § 2032A permits qualifying real estate to be valued for estate tax purposes on the basis of its actual use, it reduces these typical estate tax bills considerably because working family farms ordinarily do not yield high annual profits. *Id.* at 1062.

To determine whether Opal's farm met the "qualified use" requirement of § 2032A(b)(1)(C)(i) and the "material participation" requirement of § 2032A(b)(1)(C)(ii) we need to keep this congressional purpose in focus. While Congress will allow certain exceptional preferences to avoid excessive tax burdens under certain conditions, in order to achieve the congressional intent these exceptions must be narrowly applied and the corresponding exclusions broadly interpreted. *Cf. Corn Products Refining Co. v. Commissioners*, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955).

This court, as did the Tax Court, focuses especially upon whether the farm met the "qualified use" requirement of § 2032A(b)(1)(C)(i) and the "material participation" requirement of § 2032A(b)(1)(C)(ii) when owned by Opal and operated by Timothy as trustee. We particularly examine the four-year period of 1977–1981 because it is dispositive of this case.

B. *The 1977–1980 Period and Qualified Use*

■ The value of certain real property is defined for estate tax purposes by § 2032A(a)(1) as its value for use as "qualified real property." A "qualified use" under § 2032A(b)(2) includes "devotion of the property" to "use as a farm for farming." The statute requires that during the eight years preceding the date of death, for a total of at least five of those years (1) the farm must have been owned by a decedent or a member of the decedent's family, (2) the farm must have been used for a qualified use, and (3) the decedent or member of decedent's family must have materially participated in the farm operation. 26 U.S.C. § 2032A(b)(1)(C)(i) and (ii). For Opal's farm the eight-year pre-death period for meeting the qualified use and material participation requirements of 26 U.S.C. § 2032A began on September 23, 1973.

Section 2032A(e)(2) limits "member of the family" to ancestors, spouses, or lineal descendants and their spouses. Thus in this case only Opal and Timothy, and *not* Wayne or Jerry, qualify as family members. Since neither Wayne nor Jerry is a statutorily-defined family member, their activities are irrelevant to the qualified use or material participation tests. Only Opal's and Timothy's endeavors are relevant here.

The estate argues that the four years between 1977–1980, while Wayne operated the farm under his cash rental lease, counted toward the qualified use requirement despite the fact that Wayne is not a statutorily-defined family member. The estate explains that this conclusion is proper since § 2032A(b)(1)(C) does not require that the decedent, or a family member, be engaged in farming, and § 2032A(b)(2) does not specifically require that the decedent or a member of the decedent's family own an equity interest in the farming operations.

But Treasury Regulation, 26 C.F.R. § 20.2032A–3(b)(1) declares that the terms trade or business apply only to an active business such as a manufacturing, mercantile, or service enterprise, or to raising agricultural or horticultural commodities (as distinguished from passive investments). It provides that a "mere passive rental of property to a party other than a member of the decedent's family will not qualify."

In *Martin* this court gave substantial weight to Treasury Regulation, 26 C.F.R. § 20.2032A–3. *Martin*, 783 F.2d at 84. The courts customarily defer to such regu-

lations when they reasonably carry out the Congressional mandate. *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979). Congress has delegated to the Secretary of the Treasury and to the Secretary's delegate, the Commissioner, the task of prescribing the rules requisite to enforcement of the Code. *Id.* at 477, 99 S.Ct. at 1307. This helps ensure the Regulations are produced by experts in their subject. *Id.*

■ The question in *Martin* was whether under § 2032A the heirs to a farm had ceased putting it to a qualified use by making a cash lease of the land for a year. 783 F.2d at 82. In *Martin*, although the estate qualified for preferential treatment of the farm when the tax return was filed, when the heirs terminated the qualified use and switched to passive rental the government could levy additional tax. To identify a § 2032A(b)(2) "qualified use," *Martin* explained that the purpose of the statute is to encourage continuation of the family farm following the farm owner's death:

> That purpose will not be achieved if ... heirs are free to lease the entire farm on a fixed-price basis to an agribusiness or any other farmer indefinitely, provided only that the heirs (or one of them) continue to participate materially in the operation of the farm....

783 F.2d at 82. A "qualified use" plainly is not reached simply by material participation in the operation of the farm by the heirs. The qualified use requirement and material participation requirement are separate and distinct, and must not be overlapped in such a way as to confuse the elements of one or the other.[5]

Rentiers-heirs (i.e., heirs receiving a fixed income from their investment) forfeit the exceptionally favorable tax treatment that the statute affords to those meeting its exacting requirements. *Id.* at 84. When the *Martin* taxpayers leased the farm on a net cash basis, they left the farming business and were beyond the scope of the statute. Whether farm prices fluctuated or crops flourished or died their rental income would be unaffected because those heirs were rentiers throughout the lease, not farmers who risked the variables of weather and market price. *Id.*

■ Rentiers forego the friendly tax treatment accorded to those meeting the demanding statutory requirements. There is no qualified use during the lease of a farm under a fixed-rental agreement. Nor is there a qualified use merely because there has been material participation in the operation of the farm while the farmland was leased on a fixed-price basis to an outsider. Therefore, the qualified use requirement of § 2032A(b)(2) was not fulfilled here through crop years 1977–1980, when the farm was operated under Opal's cash rental lease with Wayne.

## C. The 1981 Period and Rental Qualified Use

The estate contends that the farm here was put to a qualified use within the meaning of the trade or business provisions of § 2032A(b)(2) under the terms of the 1981 rental agreement with Jerry Heffley, inasmuch as rental income substantially depended upon production. The estate cites as authority the *Martin* and *Schuneman* precedents.

The reason for inquiring whether rental income substantially depends on production is to learn whether the decedent had held the farmland for active trade or business uses as opposed to passive investment. To answer the question we need to determine whether the decedent had run a risk under the lease substantially approaching the risk

5. The district court opinion in *Schuneman v. U.S.*, 570 F.Supp. 1327, 1331 (C.D.Ill.1984), upon which the estate relies, tended to identify the qualified use requirement with the quite distinct material participation requirement. But in deciding *Schuneman v. United States*, 783 F.2d 694 (7th Cir.1986), this court was well aware of the precedent of *Martin v. Commissioner*, 783 F.2d 81 (7th Cir.1986). The appellate opinion in *Schuneman* cites to that precedent. *Schuneman*, 783 F.2d at 695 n. 1 and 699 n. 3. Our opinion in *Schuneman*, in which a material participation directed verdict was not appealed, is consistent with our *Martin* opinion conclusively foreclosing identification of the material participation requirement with the qualified use requirement.

that decedent would have run farming the land personally. *Schuneman,* 783 F.2d at 700. No arbitrary range of possible incomes is necessary for a lease to depend substantially upon production. *Id.* at 701.

The 1981 agreement leased the land to Jerry for rental partially in cash and partially in *fixed quantities* of commodities. The estate attaches great significance to the fact that—although Opal was entitled to receive the cash and commodities in any event—she had both downside risk and upside profit potential contingent upon commodity prices. By manipulating the time and method of the sale of her commodities, Opal could hope for maximizing rental income although risking market losses.

The Commissioner replies that both the cash and the crops were payable without regard to the farm's production. In this way the 1981 lease with Jerry Heffley resembles the leasing arrangement with Wayne Heffley over the four previous years at a fixed cash rental.

The variable worth of Opal's interest in the 1981 rental was somewhat contingent upon fluctuating commodity prices. It was not contingent upon the farm's production. This distinguishes the 1981 rental agreement here from the *Schuneman* lease. That lease contained a clause that the tenant would pay an annual rent of $32,600 if his gross income from the farm reached $51,660 and would pay only $26,080 if his gross income were below $51,660. *Id.* at 699.

The 1981 agreement with Jerry Heffley left Opal simply a rentier as comprehended in *Martin:* "[W]hether in short the farm was productive or unproductive, profitable or unprofitable, the taxpayers' rental income would be unaffected." 783 F.2d at 84. Opal would get the cash and the grain no matter what happened with the farm production. Therefore, the farm was not put to a qualified use under the trade or business provisions of § 2032A(b)(2) by the terms of Opal's 1981 rental to Jerry.

### D. *The 1981 Period and Trade Qualified Use*

■ In arguing that the farm was being used for a qualified use on the date of Opal's death, the estate recounts that under the terms of the 1981 rental agreement Timothy withheld some 100 acres of tillable land from the fields rented to Jerry. As already noted, Timothy raised beans upon approximately 15 acres and planted some three acres of trees on the farm.

Under § 2032A(b)(1)(C)(i) there is qualified use if during the crucial eight-year period there have been times totalling at least five years during which the real property was owned by the decedent and put to a qualified use by the decedent or a member of the decedent's family (like Timothy). As discussed in Section IIIB above, Treasury Regulation, 26 C.F.R. § 20.2032A–3(b)(1) provides that the terms trade or business only apply to active businesses including farms. We agree with the Tax Court that Timothy's 1981 use of 18 acres failed to establish that Timothy was engaged in the trade or business of farming when Jerry was leasing approximately 186 acres of the farm. Therefore, on this ground also, the farm was not put to a qualified use under the trade or business provisions of § 2032A(b)(2) during Opal's 1981 rental to Jerry.

### E. *The 1977–1980 Period and Material Participation*

■ In addition to the five out of eight-year qualified use requirement (not met here), there must be "material participation by the decedent or a member of the decedent's family in the operation of the farm or other business." 26 U.S.C. § 2032A(b)(1)(C)(ii). For the 1977–1980 interval the estate makes a feeble attempt to demonstrate "material participation." The estate relies upon Timothy's work as a farm hand for Wayne during the years 1977–1980. These calendar years include almost all of the four academic years beginning in September 1976 during which Timothy was a full-time student at Indiana University in Bloomington.

The parties agree that, under Treasury Regulation, 26 C.F.R. § 20.2032A–3(e)(2), "No single factor is determinative of the

presence of material participation, but physical work and participation in management decisions are the principal factors to be considered." As a result, courts determine this "material participation" element on a case by case basis.

Whether the required material participation existed is a factual determination under Treasury Regulation, 26 C.F.R. § 20.2032A–3(a):

Whether the required material participation occurs is a factual determination, and the types of activities and financial risks which will support such a finding will vary with the mode of ownership of both the property itself and of any business in which it is used. Passively collecting rents, salaries, draws, dividends, or other income from the farm or other business is not sufficient for material participation, nor is merely advancing capital and reviewing a crop plan or other business proposal and financial reports each season or business year.

The Tax Court found that during the period in question neither Opal nor Timothy participated in the management decisions of the farm. Wayne chose the brand of seeds, fertilizer and herbicide to be used, and decided times for planting, tilling and harvest. Timothy did not regularly inspect the crops, and was away in Bloomington during planting and harvest time. Timothy's first independent activity upon the farm was not until 1981.

In *Coon*, the issue was whether a member of a decedent's family had materially participated in operating a farm. 81 T.C. at 608. Because the *Coon* petitioner had not actually been employed on the farmland on a substantially full-time basis, the Tax Court considered the applicable factors set forth in Treasury Regulation, 26 C.F.R. § 20.2032A–3(e)(2). *Id.* at 609.

According to that Regulation:

As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used.

The *Coon* petitioner's participation in management decisions generally had been limited to annually discussing planned crops with tenants, directing tenants where to purchase the landlord's share of seed and fertilizer and consulting with the tenants concerning improvements or major repairs. The tenants were experienced farmers who made most of the actual operating decisions regarding the farms without consulting the petitioner. Those decisions included such critical ones as when to plow, fertilize, disk, plant and harvest. Therefore, the *Coon* petitioner had not materially participated in operating the farm. 81 T.C. at 611.

The material participation requirement can possibly be satisfied if an heir goes to work as a full-time farm laborer for a lessee. *Martin*, 783 F.2d at 82. It was because the *Coon* petitioner was *not* actually employed upon the farmland on a substantially full-time basis that the Tax Court considered the impact of Treasury Regulation, 26 C.F.R. § 20.2032A–3(e)(2). 81 T.C. at 609.

Timothy failed to satisfy the material participation requirement through the 1977–1980 period as a full-time farm laborer for Wayne. Timothy left to the tenants the actual operating decisions regarding the leased farmland; Timothy was attending classes in Bloomington at planting and harvest time. Due to Timothy's studies, he only sporadically offered first-hand attention to the farm. Timothy seldom participated in final management decisions. Therefore, there was no material participation by a family member in operating the farm while it was leased to Wayne Heffley.

## F. *The Estate Tax Deficiency Deduction*

The estate argues that, if there is an estate tax deficiency, the estate in computing the taxable estate is entitled to a deduction representing interest accruing upon the deficiency period. It contends that if this controversy is "bifurcated" by requiring that the proper computation of interest under 26 U.S.C. § 6166 be litigated as a refund claim, it would force the taxpayer to maintain a second suit resolving a single controversy. Review could be obtained only in a refund action brought by the taxpayer in the Claims Court or in a district court. The estate relies heavily upon *Estate of Baumgartner*, 85 T.C. 445 (1985).

In *Baumgartner*, the Commissioner asserted that the Tax Court lacked jurisdiction to decide issues concerning interest, and that the petitioner must bring a separate action in the Claims Court or in a district court to obtain a refund of overpaid interest. The *Baumgartner* petitioner contended that if interest were a portion of an overpayment the Tax Court can hold that interest has been overpaid. In *Baumgartner* an estate made separate installment payments of tax (principal) and interest and paid prior to the Tax Court's decision. The court concluded that was an exceptional situation. *Id.* at 448.

The Tax Court held that when it had jurisdiction to determine the *overpayment* of the tax, it also had jurisdiction to determine the overpayment of interest that the taxpayer paid with the tax. *Id.* at 458–59. The Tax Court recognized that in a structural sense the Tax Code contains provisions for interest on overpayments (refunds) and on underpayments (deficiencies), but offers no specific provisions for the interest which is a portion of an overpayment. *Id.* at 451.

We have a much different situation here, as the *Baumgartner* opinion itself explains:

As a practical matter, this Court would find it difficult to exercise jurisdiction over interest upon a deficiency. Interest does not accrue upon a deficiency, but only upon the existence of an underpayment. Sec. 6601. In order for a deficiency or tax to be unpaid, the amount must be assessed or assessable. Sec. 6213 limits the ability of ... [the Commissioner] to assess a deficiency until the decision of the Tax Court becomes final.

*Id.* at 452. This ground alone forecloses the Heffley estate's contention.

Furthermore, the estate recognizes that computation of the interest deduction must be separately determined whether interest is figured under § 6621 or § 6601(j). But an election to pay an estate tax via installments under § 6166(a) is made by attaching a notice of election to an estate tax return. Section 6601(j) does provide a favorable four percent interest on the tax deferred under § 6166. But here the executor made no such § 6166(a) election with the estate tax return. Therefore, the Tax Court concluded, and we agree, that the estate is entitled at this time neither to pay the deficiency in its estate tax in installments, nor to compute the interest on a deficiency at the reduced rate afforded by § 6601(j).

## G. *Estate Tax Deficiency Installment Payments*

The estate finally argues that it indeed did comply with the statutory requirement for electing to pay its estate tax deficiency through installments by the manner provided by § 6166. The installment payment election is available when the family farm constitutes a closely-held business, a status determined as of the time immediately preceding the decedent's death. § 6166(b)(2)(A). Consequently, the estate again asserts: that the value of the commodities deliverable to Opal under the lease terms negotiated by Timothy with Jerry for 1981 would be variable; that Timothy cultivated in 1981 of a portion of the acreage not rented to Jerry; and that in 1981 Timothy established permanent residence upon Opal's farm.

Estate tax installment payment election indeed is possible under § 6166 for the family farm as a closely-held business. But this estate does not qualify for such installment payments, for the same reason

it failed to qualify for special use valuation under § 2032A. Rather than being a closely-held business, the farm here was a property leased at a fixed rental. This rental was not dependent upon the farm's production. Therefore, the estate is unqualified to pay its estate tax deficiency through installments under § 6166.

## IV.

## CONCLUSION

There was no qualified use of the farm between 1977 and 1980 while it was leased to Wayne Heffley because cash rental to a non-family member is not a qualified use. There was no 1981 qualified use of the farm because the 1981 rental of the bulk of the farm to Jerry Heffley included no payment substantially dependent upon production. Moreover, Timothy's cultivation during that year was insufficient to constitute the business of farming. There was no material participation of a family member in managing the farm when it was leased to Wayne Heffley between 1976 and 1980, when Timothy was a student merely laboring part-time under Wayne Heffley for wages. The estate does not qualify for installment payments of the estate tax deficiency because the facts here show the farm operation was not a family business. The Tax Court was without jurisdiction to determine the computation of interest payable on petitioner's estate tax deficiency.

We affirm.

AFFIRMED.