**Mary L. BROCKMAN, as Administrator of the Estate of Selma N. Donahoe, Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

**No. 89–1559.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1989.

Decided June 5, 1990.

---

Diane Yohnka Jorstad, John W. Hynds, Hynds, Rooks & Yohnka, Morris, Ill., for petitioner-appellee.

James I.K. Knapp, Gary R. Allen, David E. Carmack, Janet K. Jones, Dept. of Justice, Tax Div., Appellate Section, Peter K. Scott, I.R.S., Washington, D.C., for respondent-appellant.

Before POSNER, COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

For the purpose of determining federal estate tax, Section 2032A of the Internal Revenue Code allows heirs to family farms to value the assets of the farm in their current use, rather than being required, like other heirs, to value the assets at their commercially most lucrative use. 26 U.S.C. § 2032A. This "special use valuation" results in substantial estate tax relief for heirs to a family farm if they can satisfy the demanding terms of the statute. The controversy in this case centers on whether a 100–acre parcel of a 443–acre farming operation qualifies for "special use valuation" under Section 2032A.

The decedent, Selma Donahoe, died intestate on November 6, 1981. At the time of her death, Donahoe owned an undivided one-half interest in a 443–acre farm. Donahoe's daughter, Mary Brockman, was the owner of the other one-half interest. Some of the 443 acres had been owned by the Donahoe family for approximately 100 years and other parts for approximately 60 years. When Donahoe died, her one-half interest in the family farm passed to Brockman, the sole heir and administrator

of Donahoe's estate. At the time of Donahoe's death, Mary Brockman, her husband Kenneth Brockman, and their four sons operated a grain and cattle business on the 443 acres. The Brockmans personally farm this property without the use of any hired help.

The 443 acres consist of four tracts of land separated from each other by several miles. The 100 acres at issue in this case is located on the fourth tract of land (Tract IV). Tract IV consists of approximately 155 acres of pasture land. In 1975, the Brockmans did not have enough cattle to use all of the 155 acres of pasture. Pursuant to an oral agreement, Donahoe and Mary Brockman leased 100 acres of Tract IV to James Dickison, an unrelated neighbor. Dickison rented the 100 acres to use as grazing land for his own cattle. Pursuant to the lease agreement, the Brockmans agreed to replace and maintain pre-existing fences around the 100 acres provided that Dickison agreed to rent the property for a minimum of five years during the grazing season. The parties set the property's rent at a flat fee of $2,100 per year.[1]

From 1975 through 1979, Dickison conducted cattle operations on the 100 acres. The Brockmans assumed no management responsibility over Dickison's cattle operation, paid no expenses with regard to the operation, kept no records of the costs or selling price of the cattle and did not share in the profits Dickison generated. Pursuant to the lease, the Brockmans built new fences and repaired the existing fences around the 100 acres to prevent Dickison's cattle from damaging the remaining 55 acres. The Brockmans' additional activities on the rented acreage consisted of inspecting and maintaining drainage tiles and mowing weeds in the summer. It is undisputed that the 100–acre pasture cannot be used for grazing cattle in the wintertime. From 1975 through 1979, Dickison vacated the 100 acres in October or November of each year and did not return until April or May the next year.

From 1975 through 1979, the Brockmans continued to utilize the unrented portion of Tract IV for their farming activities. In addition, the Brockmans have used the 100 acres for their own farming purposes since 1979, when the Dickison lease expired.

After Donahoe's death on November 6, 1981, Mary Brockman elected special use valuation for Donahoe's undivided one-half interest in Tracts I through IV, with the exception of a five-acre parcel on Tract IV containing Donahoe's residence and some farm buildings.[2] Under the special use valuation claim by the estate, Donahoe's one-half interest in the 100 acres was valued at approximately $2,380. Its fair market value, by contrast, was approximately $47,590. After auditing the estate's tax return, the Commissioner of Internal Revenue determined that special use valuation was proper for all of Tracts I, II and III, because the Brockmans actively cultivated this land as a grain farm during the relevant periods. The Commissioner also allowed special use valuation for the portion of Tract IV, consisting of approximately 50 acres, that was not leased to Dickison. However, the Commissioner disallowed special use valuation for the 100 acres that Donahoe and Mary Brockman leased to Dickison during the productive seasons of 1975 through 1979. The Commissioner contended that the leasing arrangement disqualified the estate from electing special use valuation for the 100–acre plot. As a result, the estate owed an additional $17,613 in taxes.

The estate subsequently petitioned the tax court for a redetermination of the deficiency. The tax court agreed with the estate and rejected the Commissioner's contention that the leasing arrangement dis-

---

**1.** In 1979, the last year of the lease agreement, Tom Coleman, a friend of Dickison's who is not related to Donahoe or the Brockmans, used the pasture and paid the rent. The Brockmans' level of involvement with their lessee's cattle operation was not affected by the substitution nor is our analysis in this case. Thus, we will refer to the lease of 1975 through 1979 as the "Dickison lease."

**2.** Kenneth Brockman testified that the estate declined to elect special use valuation for this five-acre parcel as part of an "estate planning situation."

qualified the estate from electing special use valuation for the 100 acres. The Commissioner now appeals the decision of the tax court. For the reasons discussed below, we reverse the decision of the tax court and reinstate the Commissioner's finding that the 100 acres do not qualify for special use valuation.

Congress enacted Section 2032A as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520, 1856. The purpose of the statute was to encourage the continuation of family farms after the death of a farm's owner. *See, e.g.,* H.R.Rep. No. 1380, 94th Cong., 2d Sess. 21–22 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 2897, 3375. To raise money to pay estate taxes, those who inherited family farms frequently had to sell their newly-inherited property. *Estate of Cowser v. Commissioner,* 736 F.2d 1168, 1170 (7th Cir.1984). The fair market method of valuation was used in calculating the inheritance tax—a method which could recognize a highest and best use such as commercial development rather than agriculture. While heirs may have wished to continue farming, valuation of the land for nonfarming purposes resulted in high estate taxes which could not be paid from continued farming operation. As enacted in 1976, Section 2032A permits qualifying farm real estate to be valued on the basis of agricultural use, and often reduces the estate tax, particularly in those cases where nonfarming land use factors increase land values. Thus, the desired effect of Section 2032A is to avoid forced liquidation of family farms in order to pay a substantial estate tax. *Heffley v. Commissioner,* 884 F.2d 279, 283 (7th Cir.1989); *Whalen v. United States,* 826 F.2d 668, 669 (7th Cir. 1987); *Schuneman v. United States,* 783 F.2d 694, 697 (7th Cir.1986).

Before this "special use valuation" will apply to real estate, however, the taxpayer must satisfy several statutory requirements. Specifically, Section 2032A requires that for a total of at least five years out of the eight years immediately preced-

ing the decedent's death: (1) the property must have been owned by the decedent or a member of the decedent's family; (2) the property must have been put to a "qualified use"; and (3) the decedent or a member of the decedent's family must "materially participate" in the qualified use. 26 U.S.C. § 2032A(b)(1)(C)(i) and (ii). The dispute over the 100 acres in this case centers on the latter two requirements—the "qualified use" and the "material participation" tests.

The statute defines "qualified use" as devotion of property to "use as a farm for farming purposes." 26 U.S.C. § 2032A(b)(2)(A). The case law and the legislative history of Section 2032A both make clear that the qualified use requirement is not satisfied if a decedent's financial stake or other involvement in land is merely that of a landlord who collects a fixed rent from an unrelated tenant. *Heffley,* 884 F.2d at 284; *Martin v. Commissioner,* 783 F.2d 81, 83 (7th Cir.1986); *Schuneman,* 783 F.2d at 698. The House Report accompanying the bill states that "[t]he mere passive rental of property will not qualify." H.R.Rep. No. 1380 *supra,* at 23, 1976 U.S.Code Cong. & Admin.News at 3377. The Senate Report accompanying some technical amendments to the statute in 1981 repeats this prohibition against passive uses: "[D]uring any period when the decedent leases the real property to a nonfamily member for use in a qualified use pursuant to a lease under which the rental is not substantially dependent upon production, the qualified use requirement is not satisfied." S.Rep. No. 144, 97th Cong., 1st Sess. 133 (1981) *reprinted in* 1981 U.S. Code Cong. & Admin.News 105, 234. In addition, the pertinent Treasury Regulation, 26 C.F.R. § 20.2032A–3(b)(1), follows the committee reports in stating that "the term trade or business applies only to an active business such as ... the raising of agricultural or horticultural commodities.... The mere passive rental of property to a party other than a member of the decedent's family will not qualify."[3] The

---

**3.** We must give substantial weight to the pertinent Treasury Regulations, even though in this

case they are interpreting statutory language rather than making a substantive rule under an

basic reason for prohibiting passive rentals is to further the purpose of the statute—preservation of family operated farming. This purpose would hardly be achieved if families were free to lease their farm on a fixed-price basis to others. *Martin*, 783 F.2d at 82.

■ Whether the decedent or members of the decedent's family "materially participated" in a qualified use is essentially a factual determination; while no single factor is determinative, two types of activities generally qualify as material participation if pursued to a sufficient degree—(1) actual physical labor on a farm; or (2) sufficient involvement in important management decisions. *Heffley*, 884 F.2d at 286; *Estate of Sherrod v. Commissioner*, 774 F.2d 1057, 1062 (11th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986). The decedent or a member of the decedent's family satisfy the material participation requirement if they are actually employed on a full-time basis (35 hours a week or more) or any lesser extent necessary to personally manage the farm. Treasury Regulation, 26 C.F.R. § 20.2032A–3(e)(1). If the decedent or members of the decedent's family do not actually labor on the farmland, at a minimum, they must regularly advise or consult with the parties who operate the farm (their tenants) and participate in making a substantial number of final management decisions. Additionally, they should regularly inspect production activities on the land and assume financial responsibility for a substantial portion of the expense involved in operating the farm. Treasury Regulation, 26 C.F.R. § 20.2032A–3(e)(2); *Heffley*, 884 F.2d at 286. The regulations and case law make clear that passively collecting rent from a tenant does not constitute material participation, nor does merely advancing capital or reviewing a crop plan or other financial reports each season. Treasury Regulation, 26 C.F.R. § 20.2032A–3(a); *Heffley*, 884 F.2d at 286; *Sherrod*, 774 F.2d at 1064. .

■ At first glance, it is easy to confuse the elements of the "qualified use" and the "material participation" requirements; nonetheless, these concepts are separate and distinct. *Heffley*, 884 F.2d at 284. While the qualified use requirement focuses on how the *property* is used by the decedent or the decedent's family, the material participation requirement focuses on the *activities* of the *decedent or the decedent's family* in the qualified use. Specifically, to satisfy the qualified use requirement, the decedent must employ the property in a use that exposes the decedent to the financial risks of farming (bad weather, fluctuating crop prices, disease of animals). *See Heffley*, 884 F.2d at 284–85; *Schuneman*, 783 F.2d at 699–700. If the decedent employs the property in a use that eliminates these risks—a lease for a guaranteed fixed rental—that use takes the decedent out of the family farming "business" and thus, is not a qualified use.

Because the qualified use requirement focuses on the risks that a landowner incurs, the requirement is not necessarily satisfied whenever the material participation requirement is satisfied. For instance, if a family leases their farmland on a fixed-price basis to a nonrelative, the family does not put that farmland to a qualified use merely because they work full-time on the farmland. As we stated in *Martin*, "[material participation] would of course be satisfied if heirs worked as full-time farm laborers for the lessee; and yet that would hardly illustrate the preservation of the family farm. It would, indeed, be something quite nearly the opposite." 783 F.2d at 82–83.

■ Equating physical activity with "qualified use" is apparently what led the tax court astray in this case. The tax court did not determine whether Donahoe or the Brockmans put the 100 acres to a qualified use during the time Dickison occupied that property with his cattle. The court found it unnecessary to resolve this issue because of its threshold finding pertaining to the duration of the Dickison lease. The Com-

express authorization from Congress. *See Rowan Cos. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981); *Martin v. Commissioner*, 783 F.2d 81, 84 (7th Cir.1986).

missioner and the estate stipulated to the tax court that the 100 acres was leased to Dickison "for the summer months of 1975 through 1979" (May or June through October or November of each year). The tax court determined that the property was leased to Dickison for, at most, a total of 35 months—May through November, or a maximum of seven months each year times five years. The court reasoned that because this 35-month lease amounted to less than three of the final eight years of Donahoe's life, it would be unnecessary to determine whether the 100 acres was put to a qualified use during the term of the lease to Dickison as long as Donahoe and the Brockmans put the property to a qualified use during the winter months of 1975 through 1979 and materially participated in that qualified use.

The tax court found that Donahoe and the Brockmans employed the 100 acres in a qualified use during the winter months because they "exercised dominion and control over the property and maintained a presence at the property and the upkeep of the property while the lessees took their cattle and went elsewhere." The court also found that the Brockmans satisfied the material participation requirement during the winter months because they took control of the property during those months; built, inspected, and repaired all fences around the 100 acres; mowed weeds on the 100 acres; monitored and maintained the drain tiles on all of Tract IV; and assumed the risk that any damage to the 100 acres during the winter months could jeopardize the terms of the Dickison lease. Emphasizing that these activities occurred during nonproductive winter months, the tax court gave substantial weight to Treasury Regulation 20.2032A–3(e)(1), which states that "[m]aterial participation is present as long as all necessary functions are performed even though little or no actual activity occurs during nonproducing seasons."

In reaching its decision, the tax court assumed that property which is not put to a qualified use during the productive portion of a calendar year (when it can be used for farming) can somehow be put to a qualified use during the nonproductive portion of the year (when it cannot be used for farming). However, this assumption is based on the erroneous belief that a decedent or a decedent's family can satisfy the qualified use requirement merely by engaging in a sufficient amount of physical activity on property they own. The qualified use requirement does not focus on physical activity, however; it focuses on whether the decedent or the decedent's family incur the risks of farming. Logically, if the Brockmans did not incur the risks of farming during the only portion of a calendar year in which the 100 acres could bear farming activity, the Brockmans could not have incurred the risk of farming for any portion of the year, regardless of what they did on the 100 acres during the nonproductive portion of the year. Both parties agree that the 100-acre tract could not support Dickison's cattle farming or any other farming activity during the winter months of 1975 through 1979. Dickison vacated the property after the grass died out each year and returned with his cattle as soon as the pasture could again support cattle grazing. The tax court found that Donahoe and the Brockmans "exercised dominion and control over the property and maintained the upkeep of the property" during the time Dickison was not in possession. Far from exposing Donahoe or the Brockmans to the risks of farming, these "upkeep activities" are more indicative of the Brockmans' role of landlord to Dickison, not co-farmer.

■ What we have said thus far does not mean that nonproductive months can never count as periods of qualified use; they can, but only when a family puts the property at issue to a qualified use during the productive season. The same holds true for the material participation requirement. The tax court emphasized Treasury Regulation 20.2032A–3(e)(1), which states that "[m]aterial participation is present as long as all necessary functions are performed even though little or no activity occurs during nonproducing seasons." However, this regulation assumes that a family has already engaged in a sufficient amount of activity during the producing season to constitute material participation.

The effect of the regulation is simply to ensure that qualified estates will not lose the nonproductive months from counting towards the statute's five out of eight year requirement. Thus, if a family employs their property in a qualified use and materially participates in that use during the productive portion of a year, the family will be credited with the qualified use and material participation requirements for the entire year, not just the length of the productive season.

Of course, if a family leases property for only a portion of the productive season, it would be entirely proper to determine whether the family used the property in a qualified use while the lessee was not in possession. That is not the case here, however. In practical terms, if we were to adopt the rationale of the tax court, we would give our stamp of approval to scenarios that clearly conflict with the purpose of Section 2032A. Suppose, as an extreme example, that the Brockmans lease their most productive farmland for twenty years in exchange for a fixed yearly rental. As here, the lease terminates at the end of the productive season and is resumed at the beginning of the growing season in the following year. During the winter, the Brockmans "take control" of the property and engage in "upkeep activities." If we accepted the rationale of the tax court, we would allow the Brockmans to retain their eligibility to elect special use valuation even though they had removed themselves from farming and become investors.

Thus, in order to determine whether the years 1975 through 1979 (including the winter months) count as periods of qualified use, we must now answer the question the tax court failed to address: did Donahoe and the Brockmans employ the 100 acres in a qualified use during the time Dickison used the property for his cattle operation?

Selma Donahoe and Mary Brockman leased the 100 acres to Dickison for a fixed rent of $2,100 per year; the amount of rent was in no way dependent upon Dickison's production or success; both Donahoe and Brockman recorded the income they received from Dickison as "pasture rent." In addition, neither Donahoe nor the Brockmans paid any expenses pertaining to Dickison's operation or shared in any profits that Dickison generated. These facts appear to be even less indicative of qualified use than were the facts in *Heffley v. Commissioner*, where we held that the qualified use requirement was not satisfied. In *Heffley*, the decedent leased property in exchange for rent payable partially in cash and partially in fixed quantities of commodities. This created both a downside risk and an upward profit potential contingent upon commodity prices. In holding that the decedent did not employ the property in a qualified use, we reasoned that a rental somewhat contingent upon fluctuating commodity prices did not expose the decedent to a magnitude of risks approaching the risks decedent would have incurred if she had farmed the land herself (as would be the case if rent was dependent upon production). 884 F.2d at 285. The Dickison rental is not remotely dependent upon commodity prices, let alone production. In fact, the facts of this case are very similar to those in *Martin v. Commissioner*. In that case, we held that the taxpayers did not satisfy the qualified use requirement where they leased their property for a fixed rental, provided general farming advice to the lessee, and assisted the lessee by clearing land and filling holes. 783 F.2d at 82, 84.

The estate virtually concedes that, on its face, the Dickison lease does not satisfy the qualified use requirements set forth in our precedents. However, the estate contends that we can distinguish this case from our precedents if we view the Dickison lease in the context of the overall Donahoe–Brockman farming operation. Some of the precedents in which lessors did not establish a qualified use have involved lessors who were either retired or who were full-time employees elsewhere and whose only connection to farming arose from involvement in management decisions. *See Heffley*, 884 F.2d at 280–81 (retired decedent and full-time student heir leased entire 280 acres); *Martin*, 783 F.2d at 82 (heirs leased entire 209 acres and returned to farming when lease ended); *but see Sherrod*, 774

F.2d at 1063 (decedent and heir personally farmed 1108 acres while leasing or not using 370 acres). The Brockmans, by comparison, are full-time farmers who hire no outside help. The estate argues that if we distinguish actual farmers from those who seek to obtain farmer status through management decisions, we can further distinguish between a lease entered into purely as an investment decision and a lease entered into as a legitimate farming/business decision. The estate argues that the Dickison lease was not entered into because the Brockmans no longer wanted to be in the farming business on the 100 acres (become full-time investors); rather, the Brockmans leased the 100 acres because it was prudent to do so in light of their cattle shortage (a legitimate family farming business decision).[4] The estate argues that because the Brockmans leased the 100 acres for a legitimate farming purpose, the lease was just another aspect of the family farming operation and should not "taint" Section 2032A application for the 100-acre portion of the entire 443-acre farm.

The Eleventh Circuit was faced with similar facts and contentions in *Estate of Sherrod v. Commissioner*. There, the decedent and his son (heir) personally farmed 1108 acres of land. They simultaneously leased (for a fixed rental) 300 acres because they could not economically farm the acreage themselves. 774 F.2d at 1058–59. In holding that the decedent and his son did not employ the 300 acres in a qualified use, the court reasoned that the qualified use requirement was not satisfied merely because the lease was consistent with good land management and benefitted the remainder of the farm. 774 F.2d at 1065–67. The same principle applies here. The estate emphasizes that Donahoe and Brockman leased the 100 acres for a "legitimate business purpose." A "legitimate business purpose" in itself, however, is not enough to satisfy the requirements of the statute. The statute recognizes that prudent business decisions in the context of a family farm operation may dictate the leasing of pasture. Section 2032A allows families a

three out of eight year grace period (before a decedent's death) to lease farmland for a fixed rental and still qualify that land for special use valuation. However, to take advantage of special use valuation, leasing must be done in accordance with the statute. Today's decision simply makes clear that families must take certain steps in order to qualify leased property for special use valuation beyond the statute's three out of eight year grace period—participate with a lessee to a sufficient degree in management decisions or physically work on the leased land; and assume some of the risks of farming, perhaps through an arrangement where rent is dependent upon production. For instance, this court has previously noted that sharecropping lease arrangements (in which a portion of the risk of farming remains on the landowner) have traditionally satisfied the qualified use requirement. *Martin*, 783 F.2d at 84; *Schuneman*, 783 F.2d at 699.

Finally, the estate argues that our decision will bring about inefficient use of farmland because it leaves family farmers with no incentive to lease unused farmland. Instead, the estate claims, farmers will be encouraged to adopt poor business practices by allowing unneeded land to lie vacant in order to preserve a tax break.

We reject this contention. First, the estate's efficiency argument does not seem to account for the statute's three out of eight year grace period. More importantly, the efficiency argument incorrectly assumes that a tax incentive exists in allowing land to lie vacant beyond the statute's three out of eight year grace period. The holding of *Estate of Sherrod* should dispel any such belief. There, the Eleventh Circuit held that 68 out of 100 acres of pasture land which the decedent did not put to any use did not fall within the qualified use category because, "[c]learly, this land was not employed in an active trade or business of the decedent or of a member of his family as is called for in the statute." 774 F.2d at 1063–64. Likewise, if the Brockmans allowed the 100 acres to lie vacant from 1975

---

4. While the Brockmans clearly had a cattle shortage going into the 1975 grazing season, it is not clear why the shortage required them to enter into a lease that lasted for five years.

through 1979, the property would not have satisfied the qualified use requirement. Far from creating an incentive for families to inefficiently use farmland, our decision makes clear that if families allow property to be unused (beyond the three out of eight year grace period), they will disqualify that property from special use valuation.

In this case, whether the livestock operation flourished or was wiped out by drought or disease, whether cattle prices rose or fell, whether in short, Dickison's activities were profitable or unprofitable, Donahoe's rental income was unaffected. *See Martin,* 783 F.2d at 84. For five of the last eight years of Donahoe's life, neither Donahoe nor the Brockmans met the statutory definition of being in the "business of farming" on this 100 acres and thus, they did not employ the 100 acres in a qualified use.

Finally, there is no need for us to determine whether the Brockmans' upkeep activities rose to the level of material participation because material participation must relate to a qualified use and there was none here.

For the foregoing reasons, the decision of the tax court is REVERSED.