ESTATE OF OPAL P. HEFFLEY, DECEASED, TIMOTHY S. HEFFLEY, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3201-85.      Filed August 11, 1987.

*Stephen J. Williams*, for the petitioner.
*Russell D. Pinkerton*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $84,373.47 in the petitioner's Federal estate tax. After concessions, the issues for our decision are: (1) Whether the petitioner is entitled to value real property in which the decedent held an interest at her death by use of

the special use valuation provisions of section 2032A, Internal Revenue Code of 1954;[1] and (2) whether the petitioner is entitled to pay interest on any deficiency in Federal estate tax at the reduced rate provided in section 6601(j).

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The decedent, Opal P. Heffley (Opal), died on September 23, 1981. The executor of her estate, Timothy S. Heffley (Timothy), resided in Auburn, Indiana, at the time the petition was filed in this case. The estate filed its Federal estate tax return with the Internal Revenue Service Center in Memphis, Tennessee.

Opal was born in Indiana on February 4, 1914. She married Max Heffley (Max) on March 23, 1954. One son, Timothy, was born of this marriage on December 22, 1957. Opal also had a daughter, Joy Shuff, by a prior marriage.

On October 5, 1966, the Heffleys purchased the farm real estate at issue from Max's mother. Such real estate had been pieced together by Max's parents through a series of purchases beginning in 1922. The farm real estate included the house in which the Heffleys resided, several outbuildings, and 296.37 acres of land. Approximately 280 acres of the land were tillable and were regularly planted with soybeans, corn, and wheat. The remainder of the land consisted of woods, open ditches, utility rights-of-way, and the buildings' site.

Max was actively engaged in the business of farming throughout his life. In addition to the acreage that he owned with his wife, Max farmed land which he rented from others. Immediately prior to his death, Max had approximately 1,000 acres of farmland under cultivation. He was assisted in farming such land by his brother, Wayne Heffley (Wayne). Wayne resided with his wife, Beth, on a farm approximately 1½ miles from Max's farm.

Max died on May 26, 1972. Around the time of Max's death, Opal assumed the responsibility of managing and

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect at the time of the decedent's death.

operating the farm for the 1972 crop year. With the assistance of relatives and neighbors, Opal supervised the spring planting. She also arranged for Wayne to conduct the summer tilling of the land and to harvest the crops. Opal received the crop proceeds and paid the crop expenses. She paid Wayne a fixed fee for his services in 1972.

After 1972, Opal entered into a sharecropping arrangement with Wayne. In time, Opal became uncomfortable with the risk involved in sharecropping and decided to lease the farmland on a cash rent basis. Consequently, on October 24, 1976, Opal entered into a "Farm Rental Contract" with Wayne. Under such contract, Opal leased 288 acres of tillable land to Wayne until February 28, 1977.[2] In exchange, Wayne agreed to pay rent for such land of $35 per acre or a total of $10,080. The lease provided that interest would be charged for any unpaid rent at a rate of 6 percent per year.

Under the lease, Wayne had full responsibility for the operation of the farm. He chose the brands of seed, fertilizer, and herbicide to be used and determined the appropriate time for planting, tilling, and harvesting crops. The lease did not call for any performance from Opal or by anyone acting on her behalf, nor was she to share in the proceeds from the crops produced on the land. On occasion, Timothy helped Wayne on the farm. He received compensation directly from Wayne for such activities. Although Opal and Wayne did not re-execute the lease in subsequent years, they continued to abide by its terms until the end of the 1980 farming season.

On September 26, 1978, Opal executed a warranty deed which conveyed her interest in the farm real estate to Timothy, as trustee. On the same day, she executed the "Opal P. Heffley Land Trust Agreement Effective on January 1, 1981" (the land trust). The trust document named Opal the sole income beneficiary of the land trust. The trust document did not provide for the disposition of the farm real estate upon termination of the land trust.

---

[2] The lease, by its terms, extended only to Feb. 28, 1977, although the parties thereto continued to operate in accordance with such lease beyond such date. Also, the lease was for a total of 288 tillable acres, although other evidence indicated that the Heffley farm included only 280 tillable acres.

On April 23, 1981, Opal executed a "Revocable Trust Agreement" (the revocable trust) and named Timothy the trustee of such trust. In such document, she transferred to the revocable trust any interest which she had in the farm real estate held by the land trust. In addition, she directed that the farm real estate be distributed to Timothy upon her death. Timothy, as trustee first of the land trust and then of the revocable trust, held title to the farm real estate from September 26, 1978, through the date of Opal's death.

On February 11, 1981, Timothy, as trustee of the land trust, entered into a farmland rental agreement with a cousin, Jerry Heffley (Jerry). In such agreement, the land trust rented approximately 186 acres of tillable farm land and the use of two outbuildings for a period of 1 year. In exchange, Jerry agreed to pay $30 and to deliver 12 bushels of corn and 3 bushels of soybeans for each of the 186 acres. The agreement released the land trust from any expenses of operating the farm except for the cost of applying limestone to the soil, if needed. The agreement did not call for any performance on the part of the land trust or of any party acting on behalf of the land trust.

Timothy was 14 years of age at the time of his father's death. Throughout high school, he helped his uncle, Wayne, farm the land. After graduating from high school, Timothy became a full-time student at Indiana University in Bloomington, Indiana. Although Bloomington is approximately 210 miles from the farm, he returned home frequently on weekends and on school holidays. He also spent all but one summer on the farm during his college years. Timothy transferred to the Fort Wayne, Indiana, campus of Indiana University for his final year of college. During such year, he established his permanent residence on the farm. Timothy received a baccalaureate degree in philosophy and political science from Indiana University in May 1981.

After graduating from college, Timothy married and began working at a series of jobs away from the farm. He worked in a warehouse, a furniture factory, and as a fundraiser for a citizen's lobbying group. He also sold solar heating equipment. Timothy's wife also worked away from the farm.

In 1981, Timothy purchased a tractor and other farm equipment and cultivated soybeans on approximately 15 acres of the farm real estate. He also planted approximately 3,000 trees on a 3-acre plot on the farm. He intended such trees to produce a marketable timber crop. He did not pay any rent to either the land trust or the revocable trust for the use of such land.

Opal filed Federal income tax returns for the years 1973 through 1980. Such returns were prepared on her behalf by professional tax return preparers. Opal's farm income for 1973 was reported on Form 4835, which states that it is "designed to report farm rental income based on crops or livestock produced by the tenant, where the landowner * * * does not materially participate in the operation or management of the farm." For the years 1974 through 1979, Opal's farm income was reported as "cash rent of farm" or "farm rent." Opal's farm income for 1980 was reported as "rent." She did not pay any self-employment tax on her farm income for the years 1973 through 1980.

Opal was hospitalized in August 1975. During her hospital stay, it was determined that she had sustained a stroke and suffered from arteriosclerosis. Although the stroke did not affect her mental functions, it caused her to become partially paralyzed and ultimately resulted in her inability to write. Opal was disabled at all times subsequent to the 1975 grain farming season. Opal resided on the farm real estate, except for periods of hospitalization, until 1980. In 1980, her health deteriorated, and she moved to a senior citizen's apartment complex. She died in a nursing home on September 23, 1981.

On its Federal estate tax return, the petitioner elected to use the special use valuation provisions of section 2032A and valued the farm real estate at $90,339.50. The petitioner attached an appraisal to such return, which indicated that the fair market value of the farm real estate was $463,000 at the time of the decedent's death. There is no dispute between the parties as to the special use value or the fair market value of the farm real estate. The petitioner did not make an election under section 6166(a) or a protective election under section 20.6166-1(d), Estate Tax

Regs., to pay part or all of the Federal estate tax due on such return in installments.

In his notice of deficiency, the Commissioner determined that the farm was not put to a qualified use by the decedent or by a member of her family for at least 5 of the 8 years preceding her death. He also determined that there was no material participation by the decedent or by a member of her family in the operation of the farm. Therefore, the Commissioner concluded that the estate was not entitled to value the farm under the special use valuation provisions of section 2032A.

In addition, the Commissioner determined that the balance in a checking account maintained by the decedent was $843.99 more on her date of death than that reported on the Federal estate tax return. He also disallowed $2,415 deducted by the estate for executor's commissions on the ground that such amount would not be paid. In its petition, the estate did not dispute the increase in the checking account or the disallowance of the executor's commissions. Therefore, we find that it has conceded such items.

On September 30, 1985, the petitioner filed an amended petition with this Court. In such amended petition, the petitioner asked that it be entitled to compute the interest on that portion of the deficiency in Federal estate tax which is attributable to the farm real estate at the reduced rate provided by section 6601(j).

OPINION

The first issue for our decision is whether the petitioner is entitled to value the farm real estate by use of the special use valuation provisions of section 2032A. Section 2032A was enacted in 1976 to provide Federal estate tax relief for the owners of farms and other small businesses. Tax Reform Act of 1976, sec. 2003(a), Pub. L. 94-455, 90 Stat. 1520, 1856; H. Rept. 94-1380 (1976), 1976-3 C.B. (Vol. 3) 735, 756. Under prior law, property in which a decedent had an interest at death generally was included in the decedent's gross estate at the fair market value of such interest at the date of death or at the alternate valuation date. Secs. 2031, 2032. Such fair market value was determined with reference to the property's "highest and best use." Con-

gress was concerned about the perceived unfortunate tax consequences which resulted from valuing real property used in a small business at its highest and best use rather than at its then-existing family use. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 643, 657.

In response to such a concern, section 2032A was enacted to allow an executor to value certain qualified real property by using an "income capitalization" method of valuation, rather than the traditional fair market value based on highest and best use. See sec. 2032A(e)(7); *Estate of Coon v. Commissioner*, 81 T.C. 602, 607 (1983). The relief provided by section 2032A is limited in several ways. The decedent must have been a citizen or a resident of the United States, and the subject property must be located in the United States. The real property must have been used as a farm or in a trade or business by the decedent or a member of the decedent's family, and the decedent or a member of the decedent's family must materially participate in the operation of the farm or the business. Real property qualifies for special use valuation only if it passes to a member of the decedent's family. The use and ownership requirements must continue for 15 years after the decedent's death to avoid recapture of part of the tax savings resulting from special use valuation. Sec. 2032A(c). These requirements all express the intent of Congress to limit the tax relief to what is generally regarded as a family farm or business. See *Estate of Cowser v. Commissioner*, 80 T.C. 783, 785 (1983), affd. 736 F.2d 1168 (7th Cir. 1984); *Estate of Geiger v. Commissioner*, 80 T.C. 484, 488 (1983).

The parties agree that all the provisions of section 2032A have been met except for the "qualified use" requirement of section 2032A(b)(1)(C)(i) and the "material participation" requirement of section 2032A(b)(1)(C)(ii). Thus, the issues for decision are whether the farm real estate was put to a qualified use by the decedent or a member of her family and whether there was material participation by the decedent or a member of her family in the operation of the farm.

Section 2032A(b)(2) defines a "qualified use" to be the use of the property as a farm for farming purposes or in a trade or business other than farming. Such qualified use must occur for at least 5 years of the 8-year period ending on the

date of the decedent's death. Sec. 2032A(b)(1)(C)(i). Thus, the relevant period began on September 24, 1973, and ended on September 23, 1981, the date of Opal's death.

For purposes of section 2032A, family member means, with respect to any individual, "only such individual's ancestor or lineal descendant, a lineal descendant of a grandparent of such individual, the spouse of such individual or the spouse of any such descendant." Sec. 2032A(e)(2). Wayne was Opal's brother-in-law, and Jerry was a cousin of Opal's husband. Therefore, neither qualifies as a family member within the terms of the statute, and their farming activities are not relevant in determining whether the property was put to a qualified use or whether there was material participation in the operation of the farm. Thus, we will consider only the activities of Opal and Timothy in our analysis.

The regulations under section 2032A provide:

All specially valued property must be used in a trade or business. * * * Under section 2032A, the term trade or business applies only to an active business * * * as distinguished from passive investment activities. The mere passive rental of property to a party other than a member of the decedent's family will not qualify. * * * [Sec. 20.2032A-3(b), Estate Tax Regs.]

From 1976 until Opal's death, the farm real estate was leased to non-family members for rental amounts not substantially dependent upon crop production. The contract between Opal and Wayne called for a flat rental of $10,080 per year. Such rental was due and payable without regard to any production from the farm. The lease agreement executed by Timothy, as trustee of the land trust, and Jerry also called for a cash rental of $30 and delivery of 12 bushels of corn and 3 bushels of soybeans for each acre rented. There was nothing in such lease that required the corn and soybeans to be grown on the farm. Thus, the rent in such lease was due and payable whether or not crops were actually produced on the farm. Neither lease called for Opal to provide any services in managing the farm, and in fact, her poor health prevented her from rendering any such services. Thus, we conclude that both leases involved the passive rental of the farm real estate to Wayne and to Jerry Heffley and that Opal's activity with respect to the farm

did not constitute a trade or business. See *Estate of Martin v. Commissioner*, 84 T.C. 620 (1985), affd. 783 F.2d 81 (7th Cir. 1986); *Estate of Abell v. Commissioner*, 83 T.C. 696 (1984).

Similarly, we cannot conclude that Timothy was actively engaged in the trade or business of farming. His first independent activity on the farm began in 1981, when he cultivated 15 acres of soybeans and planted 3 acres of trees. In our view, the use of 18 acres was insufficient to establish that he was engaged in the trade or business of farming, especially since at the same time, Jerry had approximately 186 acres of the farm under cultivation. We note that Timothy helped Wayne operate the entire farm in prior years. However, after he entered college in 1978, Timothy was only able to help during the summers, on school holidays, and on some weekends. Further, he was paid directly by Wayne for his efforts. Thus, his income was based on the time he spent assisting Wayne and was not dependent upon the level of crop production on the farm. For such reasons, we conclude that Timothy also was not engaged in the trade or business of farming and, therefore, that the farm real estate was not put to a qualified use, as required by section 2032A(b)(1)(C)(i).

We must now consider whether either Opal or Timothy materially participated in the operation of the farm during the period in issue. Whether such material participation occurred is a question of fact. Sec. 20.2032A-3(a), Estate Tax Regs. The petitioner bears the burden of proof with respect to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

The regulations provide a number of factors which may be considered in determining whether material participation occurred. Sec. 20.2032A-3(e)(2), Estate Tax Regs., provides:

No single factor is determinative of the presence of material participation, but physical work and participation in management decisions are the principal factors to be considered. As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. * * * Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the

operation of the farm or other business in which the real property is used. * * *

The record shows that Opal did not do any physical work during the period in issue. Indeed, she suffered a stroke in 1975, which left her disabled. Timothy did perform occasional minor chores on the farm. However, as we have noted, he was not working for his own account; rather, he worked for Wayne and was compensated directly by Wayne for his efforts.

Moreover, neither Opal nor Timothy participated in the management decisions on the farm. The record is clear that both Wayne and Jerry, as lessees, made all important decisions regarding the operation of the farm. They chose the brands of seed, fertilizer, and herbicide to be used and determined the proper rotation of crops. They also determined the appropriate time for planting, tilling, and harvesting crops. They neither sought nor received the advice of Opal and Timothy on such matters.

Neither Opal nor Timothy regularly inspected the crops cultivated on the farm. Opal was unable to do so because of her poor health. Timothy was away at college in Bloomington during planting and harvesting time. Finally, neither Opal nor Timothy assumed financial responsibility for any of the expenses of operating the farm. They were not required to do so under either lease. In fact, the lease executed with Jerry expressly released them from liability for practically all expenses of the farm. They were only liable for the incidental expenses of applying lime to the soil and then only if it was found to be necessary.

From 1975 until her death, Opal received income under the lease agreements with Wayne and Jerry. However, she did not treat such income as income from self-employment on her Federal income tax returns and did not pay self-employment taxes on such income. There is no evidence in the record to indicate that her estate filed amended returns and paid such taxes. According to the regulations, failure to pay self-employment taxes on farm income raises a presumption that the recipient of such income did not materially participate in the operation of the farm. Sec. 20.2032A-3(e)(1), Estate Tax Regs.

The income received by Opal from both leases was not at risk, nor was such income in any way dependent upon crop production on the farm. Neither she nor anyone acting on her behalf was required by the leases to render any services to the lessees. Thus, we conclude that Opal merely passively collected rent under the lease agreements and that neither she nor Timothy materially participated in the operation of the farm during the period in issue. Sec. 20.2032A-3(a), Estate Tax Regs. See *Estate of Martin v. Commissioner, supra; Estate of Abell v. Commissioner, supra.*

The next issue for our decision is whether the petitioner is entitled to pay interest on its deficiency in Federal estate tax at the reduced rate provided in section 6601(j). Section 6601(j) provides that if an estate is eligible to pay part or all of its Federal estate tax liability pursuant to the installment payment provisions of section 6166, then interest attributable to the tax which may be paid in installments shall accrue at an annual rate of 4 percent. Section 6166 permits an executor to pay part or all of its Federal estate tax liability in installments if a significant portion of the adjusted gross estate consists of "an interest in a closely held business." Sec. 6166(a)(1). An election, or a protective election, under section 6166(a) to pay the estate tax in installments must be made by the time prescribed for filing the Federal estate tax return (sec. 6166(d); sec. 20.6166-1(b), (d), Estate Tax Regs.), that is, 9 months after the decedent's death. Sec. 6075(a). However, if a deficiency in the estate tax is assessed, if the election has not been made under section 6166(a) to pay the tax in installments, and if the estate otherwise qualifies to make the election under section 6166, the executor may, within 60 days after issuance of notice and demand for payment, elect to pay the deficiency in installments. Sec. 6166(h); sec. 20.6166-1(c)(1), Estate Tax Regs.

Since this Court's jurisdiction is limited to determining the amount of a deficiency, we generally decline to consider issues relating to interest accruing on a deficiency. See, e.g., *LTV Corp. v. Commissioner,* 64 T.C. 589, 597 (1975).[3] However, in certain circumstances, the amount of interest

---

[3]See also *Brunwasser v. Commissioner,* T.C. Memo. 1986-197; *Benson v. Commissioner,* T.C. Memo. 1985-615.

accruing on a deficiency is relevant in determining the amount of the deficiency itself. Interest payable on a deficiency in Federal estate tax may be computed at either the adjusted rate determined under section 6621 or the 4-percent rate prescribed by section 6601(j). It is well settled that interest attributable to a deficiency in Federal estate tax is deductible as an administrative expense in determining the taxable estate. *Estate of Bahr v. Commissioner*, 68 T.C. 74 (1977); sec. 20.2053-3, Estate Tax Regs. Thus, the determination of the Federal estate tax liability of an estate, and any deficiency owed by such estate, depends on the amount of interest payable by the estate. For such reason, the petitioner argues that the issue of whether the estate is entitled to pay a reduced rate of interest on its deficiency in Federal estate tax falls within this Court's jurisdiction to determine the amount of a deficiency. See secs. 6211(a), 6214(a). Cf. *Estate of Baumgardner v. Commissioner*, 85 T.C. 445 (1985); *Estate of Papson v. Commissioner*, 81 T.C. 105 (1983). The Commissioner argues vigorously that we have no such authority. See *Estate of Meyer v. Commissioner*, 84 T.C. 560 (1985); *Estate of Sherrod v. Commissioner*, 82 T.C. 523 (1984), revd. on other grounds 774 F.2d 1057 (11th Cir. 1985).

No election or protective election requesting such an installment payment plan was made by the executor when the decedent's Federal estate tax return was filed. Consequently, it is clear that the petitioner is not entitled, at this time, to make an election under section 6166(a) and to pay the estate tax in installments. We do not reach the question of whether we would have the jurisdiction to review the interest payable on a deficiency determined by the Commissioner in his notice of deficiency if an election or a protective election had been made on the estate tax return. There remains the possibility of the petitioner's claiming that it has the right to make an election under section 6166(h) to pay the deficiency in installments. Since any such election can only be made after the deficiency is assessed (sec. 6166(h)(1)(A)), the election can only be made after this Court has entered a final decision. Sec. 6213(a). Under such circumstances, there would be no opportunity for this Court to review the interest payable on such deficiency. We must

conclude that we have no authority to review the petitioner's claim for the computation of interest under section 6601(j).[4]

*Decision will be entered for the respondent.*

---

[4]Congress may wish to reconsider sec. 6166 to provide a procedure under which this Court may review the interest to be allowed in determining a deficiency payable in installments under sec. 6166(h).