MARGARET A. LAWINGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 25955–92.     Filed September 1, 1994.

*Robert J. Jackson,* for petitioner.
*Mark J. Miller,* for respondent.

PARKER, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year 1989 in the amount of $57,191. Respondent also determined an accuracy-related penalty under section 6662(a) in the amount of $11,438.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues remaining for decision are:

(1) Whether petitioner's discharge of indebtedness income is excludable from gross income under section 108(a)(1)(C) as discharge of "qualified farm indebtedness"; and

(2) whether petitioner is liable for the accuracy-related penalty under section 6662 based upon a substantial understatement of income tax.

---

[1] In the notice of deficiency, respondent determined that petitioner did not report discharge of indebtedness income in the amount of $199,701 in the taxable year 1989. In her opening brief, respondent concedes that, due to petitioner's insolvency, only $70,313 of that amount is taxable if the indebtedness is found not to be qualified farm indebtedness.

In addition, the parties agree that, for purposes of secs. 61 and 108, petitioner's obligations to the Farmers Home Administration (FmHA) were discharged in 1989, and the shared appreciation agreement does not create contingencies that would result in the discharge occurring in a subsequent year. Accordingly, the parties agree that, if petitioner is required to report taxable income as a result of the agreements entered into with the FmHA during 1989, said income is taxable in 1989.

## FINDINGS OF FACT

The parties submitted this case fully stipulated pursuant to Rule 122(a). The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

At the time the petition was filed in this case, petitioner Margaret Lawinger resided in Dodgeville, Wisconsin. Petitioner was married to Daniel E. Lawinger (Mr. Lawinger), who died in 1986. Until Mr. Lawinger's death in 1986, petitioner and Mr. Lawinger operated a beef farm on farmland that they owned on Route 3, Dodgeville, in Iowa County, Wisconsin. Between 1966 and 1978, petitioner and Mr. Lawinger had borrowed money, under four separate loans, from the Farmers Home Administration (the FmHA), using their farmland as collateral. They executed a note for each loan and granted mortgages to the FmHA. At the time of Mr. Lawinger's death, petitioner and Mr. Lawinger still owed balances on all of the FmHA loans.

After Mr. Lawinger's death, petitioner sold all of the livestock and farm machinery related to the beef farm but retained and continued to live on the farm. Proceeds from the sale of the livestock and the machinery were reported on Form 4797 of petitioner's 1986 Federal income tax return.

After liquidating the beef farming operation, petitioner continued to live on the farm and to support herself through employment as a waitress. Petitioner also received small amounts of interest on bank accounts. In addition, from 1986 through 1989, petitioner rented the farmland for agricultural use. She leased it to a farmer under a cash rent agreement (at a fixed rate per acre without regard to farm production) and not on a crop share agreement basis. The parties agree that the farm rental proceeds in 1986 and 1988 are not attributable to farming. There is a dispute as to 1987.[2]

During 1987 and 1988, petitioner received Wisconsin Farmland Preservation Act credits. The State of Wisconsin established the Farmland Preservation Credit Program in 1977 to preserve Wisconsin farmland through a system of credits and land use restrictions. Owners of farmland can

---

[2] Petitioner indicated on Schedule E of her 1987 return that she "actively participated in the operation" of the rental real estate property listed (i.e., the farm). She also claimed deductions of $175 for supplies, $288 for repairs, and $2,000 for fertilizer.

qualify for participation in the program in one of two ways: (1) Program participants can sign a farmland preservation agreement in which they agree not to develop their land for a specified period of time, or (2) the participants' land can be zoned and used exclusively for agricultural use. Petitioner did not sign a farmland preservation agreement. However, Iowa County, the county in which petitioner's 80 acres of farmland is located, has an exclusive agricultural use zoning ordinance, and petitioner's land is zoned for exclusive agricultural use. Petitioner received Farmland Preservation Act credits from the State of Wisconsin for her farmland in the amount of $1,030 for 1987 and $3,438 for 1988.[3]

During 1989, petitioner applied for a restructuring of her debt with the FmHA. On March 7, 1989, the FmHA notified petitioner that she qualified for a debt restructuring and offered her a restructuring agreement. Petitioner accepted the offer and entered into an agreement with the FmHA on May 17, 1989. At the time of the loan restructuring, the principal balance due on the loans was $242,453, and the interest balance due was $160,916. The loan restructuring resulted in four loans totaling $242,453 being canceled in exchange for a new note for $42,752. Interest in the amount of $160,916 was written off completely. The new note carries an interest rate of 8 percent and has a maturity date of May 17, 2017.

As a condition of the debt restructuring, the FmHA required petitioner to enter into a "shared appreciation agreement". The shared appreciation agreement requires petitioner to pay a portion of any positive appreciation in the market value of the farmland to the FmHA if certain contingencies occur within certain time periods. If the contingencies do not occur within the time periods designated under the agreement, the shared appreciation agreement ends, and petitioner's only continuing obligation to the FmHA is the repayment of the new note. See *supra* note 1.

---

[3] The Department of Revenue of the State of Wisconsin prepared a publication (Publication 503), explaining the Wisconsin Farmland Preservation Credit Program, a copy of which is part of the record in this case. Section III of the publication sets forth the conditions that must be met each year to qualify for that year's credit. One of the conditions requires that at least $6,000 of gross farm profits, as defined, must have been produced that year on the farmland on which the claim for credit is based. If the owner of the farmland rents the land, the renter's gross farm profits are used to satisfy this requirement.

As of the date of the restructuring of her FmHA loans, petitioner's liabilities exceeded her assets, giving her a negative net worth.[4]

Prior to the due date of petitioner's 1989 Federal income tax return, the FmHA issued four Forms 1099–G to petitioner for discharge of indebtedness. These Forms 1099–G reflect that petitioner had received discharge of indebtedness income totaling $199,701 during the taxable year 1989 ($242,453 old principal balance less $42,752 new principal balance). Petitioner did not report any of this amount on her 1989 tax return. In the notice of deficiency respondent increased petitioner's income by $199,701. Respondent now concedes that petitioner need report only the amount by which the discharge of indebtedness income exceeds her negative net worth, an amount of $70,312 ($199,701 − $129,389). See *supra* notes 1, 4.

OPINION

I. *Qualified Farm Indebtedness*

The issue in this case is whether the discharge of petitioner's loans from the FmHA gave rise to taxable discharge of indebtedness income or whether the discharged indebtedness was "qualified farm indebtedness", excludable under section 108(a)(1)(C).

Under section 61(a)(12), gross income includes discharges of indebtedness. Under section 108, however, gross income does not include discharge of indebtedness income to the extent that the taxpayer was insolvent at the time of the discharge. Sec. 108(a)(1)(B), (d)(3). Respondent concedes that petitioner is entitled to exclude $129,389 of the discharged indebtedness in this case due to this insolvency exclusion. See *supra* notes 1, 4. Respondent, however, maintains that

---

[4] Petitioner's assets, as of May 17, 1989, were cash in the amount of $18,310, the farm valued at $89,500, an automobile valued at $2,000, and personalty of $15,000, totaling $124,810. Her liabilities were mortgage principal of $242,453, mortgage interest of $160,916, and real estate taxes of $11,746, totaling $415,115. The difference, $290,305, constitutes petitioner's negative net worth. However, both the FmHA and respondent properly excluded the forgiven interest from the discharge of indebtedness income. Sec. 108(e)(2). Thus, a more meaningful computation of petitioner's negative net worth for purposes of this case would be assets of $124,810 less liabilities of $254,199 ($242,453 + $11,746) equals negative net worth of $129,389. Accordingly, the discharge of indebtedness income of $199,701 exceeds petitioner's negative net worth by an amount of $70,312. Both parties basically accept this figure, but there is a $1 error in respondent's calculations on brief.

petitioner must include in income the amount of the discharged indebtedness in excess of her negative net worth, namely, $70,312. Petitioner argues that the full amount of the discharged indebtedness should be excluded from income because it constitutes qualified farm indebtedness.

Section 108(a)(1)(C) provides that gross income does not include any amount which would be includable in income by reason of a discharge of indebtedness if the indebtedness discharged is qualified farm indebtedness. "Qualified farm indebtedness" is defined in section 108(g)(2):

> For purposes of this section, indebtedness of a taxpayer shall be treated as qualified farm indebtedness if—
>
>      (A) such indebtedness was incurred directly in connection with the operation by the taxpayer of the trade or business of farming, and
>
>      (B) 50 percent or more of the aggregate gross receipts of the taxpayer for the 3 taxable years preceding the taxable year in which the discharge of such indebtedness occurs is attributable to the trade or business of farming.

Respondent does not dispute that the loans from the FmHA were incurred in connection with petitioner's operation of a farm and therefore satisfy the requirement of section 108(g)(2)(A). Respondent asserts, however, that petitioner does not satisfy the aggregate gross receipts test of section 108(g)(2)(B).

Respondent has determined that the total amount of petitioner's aggregate gross receipts for 1986 through 1988 is $165,383. Petitioner agrees. Those items of gross receipts are as follows:

| | Years | | |
| Items | 1986 | 1987 | 1988 |
|---|---|---|---|
| Wages | $18,136 | $19,280 | $18,705 |
| Interest | -0- | 1,800 | 1,831 |
| Gross sale price from sale of livestock | 12,868 | -0- | -0- |
| Gross sale price from sale of farm machinery | 37,566 | -0- | -0- |
| Gross farm rental | 6,810 | 8,000 | 6,600 |
| Gross income from farming | 29,319 | -0- | -0- |
| Wisconsin farmland preservation credit | -0- | 1,030 | 3,438 |
| Totals | 104,699 | 30,110 | 30,574 |

Thus, at least 50 percent of the total $165,383, namely at least $82,691.50 of the aggregate gross receipts for the 3-year period, must be "attributable to the trade or business of farming". Sec. 108(g)(2)(B).

The parties have attempted to identify those items that are "attributable to the trade or business of farming". The parties agree that the Schedule F gross receipts received by petitioner in 1986 in the amount of $29,319 are attributable to farming. Respondent has conceded that the $12,868 sale price received from the sale of the livestock when the beef farming operation was liquidated qualifies as gross receipts attributable to the trade or business of farming.[5] The parties also agree that the wages, interest, and the 1986 and 1988 gross farm rental income received by petitioner during the 3-year period preceding 1989 do not constitute gross receipts attributable to farming.

As a result of respondent's analysis, respondent has determined that petitioner's gross receipts attributable to farming, $42,187 ($12,868 + $29,319), represent only 25.5 percent of petitioner's aggregate gross receipts, an amount considerably less than the 50 percent needed to qualify under section 108(g)(2)(B). Petitioner contends that, of the total aggregate gross receipts of $165,383, no less than $92,221, or 55.76 percent, is attributable to the trade or business of farming. Petitioner includes the $37,566 received from the sale of farm machinery, the 1987 farm rental income ($8,000), and the Wisconsin Farmland Preservation Act credits ($4,468). Thus, three items remain in dispute: (1) The proceeds from the sale

---

[5] Respondent conceded on opening brief that the livestock sale proceeds qualify as gross receipts attributable to the trade or business of farming. Although not withdrawing the concession, respondent noted in her reply brief that this concession may have been made in error. Respondent asserted that, at the time the concession was made, she assumed that the livestock was held for purposes of resale. Upon further study of the record in this case, respondent discovered that the sale of the livestock had been reported as sec. 1231 gain. This treatment would indicate that the livestock was held for "draft, breeding, dairy or sporting purposes" rather than for resale. Thus, respondent concluded that the livestock does not represent an asset used in the trade or business of farming. In such case, respondent suggested that, to be consistent with her position regarding the farm machinery sale proceeds, she should not have conceded that the livestock sale proceeds constitute receipts attributable to farming. Respondent reiterated that the livestock sale proceeds concession should not adversely affect her position advocating exclusion of the farm machinery sale proceeds from gross receipts attributable to the trade or business of farming. Nevertheless, the concession regarding the sale of the livestock has been made, respondent has not withdrawn the concession, and we accept it. However, without the concession, we would nevertheless have held that such livestock sales proceeds are attributable to the trade or business of farming.

of the farm machinery, (2) the 1987 gross farm rental income, and (3) the Farmland Preservation Act credits.·

In determining petitioner's aggregate gross receipts "attributable to the trade or business of farming", we must interpret that phrase by giving it its common meaning. The term "attributable to" has no particular technical significance under the tax laws; nowhere in the Internal Revenue Code is such term defined. The phrase "attributable to" is used, and has been interpreted, in various tax and nontax contexts. Under the definition of collapsible corporation under section 117(m) of the 1954 Code, the Supreme Court interpreted "attributable to", in the phrase "gain attributable to such property", as "merely [confining] consideration to that gain caused or generated by the property in question". *Braunstein v. Commissioner,* 374 U.S. 65, 70 (1963). In interpreting the statutory language of section 165(i) of the 1954 Code that governs the ability of taxpayers to claim refunds or credits for property expropriated by the Government of Cuba, the U.S. District Court for the Southern District of Mississippi held that the normal meaning of one thing to be attributed to another is that one thing is caused or brought about by that other thing. *Ogden v. United States,* 432 F. Supp. 214, 216 (S.D. Miss. 1975) (citing Webster's Third New International Dictionary), affd. 555 F.2d 134 (5th Cir. 1977). These interpretations are based on the conclusion that "attribute" or "attributable" connotes causation. See *National Association of Greeting Card Publishers v. United States Postal Service,* 462 U.S. 810, 823 (1983); *Watson v. Employment Sec. Commn. of North Carolina,* 432 S.E.2d 399, 401 (N.C. Ct. App. 1993). For example, section 6663(a) provides: "If any part of any underpayment * * * is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is *attributable to* fraud." (Emphasis added.) Similarly, the accuracy-related penalty provision provides that the penalty applies "to the portion of any underpayment which is *attributable to*" negligence, substantial understatement of income tax, etc. Sec. 6662(b). Thus, the plain meaning of "attributable to" is simply due to, caused by, or generated by.

Section 108(g)(2)(A) expressly refers to "the operation by the taxpayer of the trade or business of farming". Although not expressly repeated in section 108(g)(2)(B), the term "the

trade or business of farming" used therein refers to the same farming operation; i.e., the *taxpayer's* farming activities, not the farming activities of a lessee. The legislative history of section 108 shows that the gross receipts test is applied by dividing the taxpayer's aggregate gross receipts from farming for the 3-taxable-year period preceding the taxable year of the discharge by the taxpayer's aggregate gross receipts from all sources for that period. S. Rept. 100–445, at 29–30 (1988). This interpretation is in keeping with the purpose of the statute: assisting farmers to keep and continue operating their farms and to avoid bankruptcy. 135 Cong. Rec. S5078–02 (daily ed. May 10, 1989).

Petitioner's situation presents a sympathetic yet difficult case. Fortunately for petitioner the 50-percent test is applied to aggregate gross receipts received over the 3-year period prior to the year of debt discharge, not to gross receipts received each year of the test period. Had petitioner's debt restructuring occurred a year earlier, the gross receipts test no doubt would have been satisfied. In this case, petitioner and her husband operated a beef farm, and, after his death, petitioner liquidated the beef farming operation in 1986. Then, petitioner rented the farmland for agricultural use but on a cash rental basis (at a fixed rate per acre not related to production) and not on a sharecrop arrangement. Although petitioner maintained her home on the farm and continued to ensure that the farmland was being used exclusively for agricultural purposes, the lessee did the farming; petitioner was not in the trade or business of farming during the last 2 years of the 3-year test period.

The statute does not require that the taxpayer be in the trade or business of farming in each year of the 3-year-test period. However, the fact that petitioner herself was not engaged in farming all 3 years necessarily makes it more difficult for her to establish that the three disputed items are to be considered "gross receipts * * * attributable to the trade or business of farming". Sec. 108(g)(2)(B).

### Proceeds From Sale of Farm Machinery

In determining petitioner's gross receipts from the trade or business of farming, respondent does not include the gross proceeds from the sale of the farm machinery ($37,566)

because, unlike the livestock that represented inventory of the beef farm and, thus, ordinary trade or business income (see *supra* note 5), the income from the sale of the machinery was the result of the sale of capital assets. Respondent contends that the Internal Revenue Code consistently distinguishes these types of income.[6] Petitioner argues that the machinery was used during the operation of the beef farm and that the proceeds from its sale would be "attributable to" that trade or business.

We agree. The proceeds from the sale of the farm machinery are attributable to petitioner's beef farm operations in 1986. Respondent attempts to distinguish between the sale of inventory and the sale of capital assets for purposes of the gross receipts test. We find that such an interpretation of the test is unduly restrictive and inappropriate under the terms of section 108. The statute speaks only of gross receipts. The proceeds from the sale of the farm machinery are gross receipts attributable to petitioner's trade or business of farming, albeit the liquidation of that activity. Nevertheless, we do not think that a distinction should be drawn, for purposes of the determination of aggregate gross receipts under section 108, between sales of inventory items and sales of capital assets, whether or not the beef farm had continued operations. We hold that the proceeds from the sale of farm machinery are attributable to petitioner's trade or business of farming.

### 1987 Gross Rental Income

Respondent also contends that the 1987 gross rents from the farmland ($8,000) are not attributable to petitioner's trade or business of farming because the amounts of rent collected were not dependent upon farm production, and, if any trade or business of farming occurred, it was carried on by the lessee, not by petitioner. Sec. 1.175–3, Income Tax Regs.; see also *Williamson v. Commissioner,* 974 F.2d 1525 (9th Cir. 1992), affg. 93 T.C. 242 (1989); *Heffley v. Commissioner,* 884 F.2d 279 (7th Cir. 1989), affg. 89 T.C. 265 (1987). Petitioner concedes that the gross farm rental income she received in 1986 and 1988 would not be considered gross farming

---

[6] Respondent refers to the distinguishable treatments of income from the sale of capital assets and of income from a trade or business under the self-employment tax provisions of sec. 1402.

receipts in this case. However, petitioner contends that the 1987 gross farm rental income should be included in the gross farming receipts calculation because she participated in the operation of the farm during that taxable year.

In 1987 and 1988, petitioner rented her farmland, or a portion thereof,[7] to a farmer who put the land to agricultural use. Petitioner did not share in the crop production of the farm but rather received a fixed cash rent per acre. Petitioner checked a block on Schedule E of her 1987 tax return indicating that, for the rental real estate property listed (i.e., the farm), she actively participated in the operation of the activity during the tax year. She also deducted on Schedule E payments for repairs, fertilizer, and other supplies for the farm. See *supra* note 2. However, without further supporting evidence, we cannot find from the tax return alone that she indeed was engaged in the trade or business of farming in 1987. Tax returns do not establish the truth of the facts stated therein. *Wilkinson v. Commissioner,* 71 T.C. 633, 639 (1979); *Roberts v. Commissioner,* 62 T.C. 834, 837 (1974). Although this is a fully stipulated case, petitioner still bears the burden of proof and must establish the facts necessary to her case. *Borchers v. Commissioner,* 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991). Therefore, based upon the record as a whole, we have found that petitioner did not participate in farming activities in 1987. As a result, the rental income received in 1987 cannot be included in gross receipts attributable to petitioner's trade or business of farming.

*Wisconsin Farmland Preservation Act Credits*

Respondent also does not include the credits received by petitioner from the State of Wisconsin under the Farmland Preservation Act ($4,468) in the farm gross receipts determination. Respondent asserts that these credits do not qualify as gross receipts from the trade or business of farming because, after liquidating the beef farming operation in 1986, petitioner was not actively farming the land herself.

[7] There was also rental income in 1986, but that year there was also actual farming by petitioner and Schedule F gross receipts of $29,319 from that farming activity. It is not clear in the record of this case what portion of the 80 acres of farmland that petitioner rented since she continued to live on the farm, and that farm rental income did not vary greatly over the 3-year period; i.e., $6,810, $8,000, and $6,600, respectively.

Respondent contends that, in fact, the State of Wisconsin was paying petitioner for her inaction in not developing the land.

Petitioner contends that the credits received from the State of Wisconsin qualify as gross receipts attributable to farming. Petitioner asserts that the nature of this credit requires that petitioner be actively involved in the preservation of her own farmland for agricultural use and by definition is the receipt of a credit (income) attributable to the trade or business of farming. As a result, petitioner concludes that, on its face, the credit qualifies and should be included in the aggregate gross receipts attributable to the trade or business of farming.

The Farmland Preservation Act credits received by petitioner in 1987 and 1988 are associated with petitioner's efforts to preserve her farmland for agricultural use. Petitioner received those credits, not for an agreement not to develop her land, as respondent suggests, but for the fact that her farmland was zoned and used for exclusively agricultural purposes. Petitioner argues that, since she was actively involved in preserving her farmland for agricultural use in 1987 and 1988, the credits she received for those years constitute gross receipts attributable to the trade or business of farming. The Wisconsin Farmland Preservation Act expressly requires a minimum of $6,000 of gross farm profits. However, those gross farm profits can be, and in this instance were, those of the lessee rather than of the landowner. See *supra* note 3.

We do not think that petitioner's credits from the State farmland preservation program, which were based on the zoning ordinance and the fact that the lessee was farming the land, rise to the level of gross receipts attributable to the trade or business of farming by petitioner. Therefore, we hold that the Farmland Preservation Act credits petitioner received for 1987 and 1988 are not gross receipts attributable to the trade or business of farming within the meaning of section 108(g)(2)(B).

In conclusion, petitioner's aggregate gross receipts attributable to farming for the 1986 through 1988 gross receipts test period are $79,753 ($42,187 amount conceded by respondent + $37,566 farm machinery proceeds), which constitutes 48.2 percent of the total aggregate gross receipts for

that period. As a result, petitioner's indebtedness is not qualified farm indebtedness under section 108(g)(2), and therefore the discharge of that indebtedness is not excludable from gross income under section 108(a)(1)(C). Accordingly, petitioner must report in income the amount by which the discharge of indebtedness income exceeds her negative net worth, an amount of $70,312.

## II. *Accuracy-Related Penalty*

Section 6662(a) and (b) imposes an accuracy-related penalty equal to 20 percent of any underpayment that is attributable to a "substantial understatement of income tax". The term "substantial understatement" is defined as the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year or (2) $5,000. Sec. 6662(d)(1)(A).

Petitioner reported a tax liability of zero for the taxable year 1989. The omission of the discharge of indebtedness income in the amount of $70,312 results in an understatement of income tax that clearly exceeds either of the statutory floor amounts. Petitioner had a substantial understatement of her tax liability on her 1989 tax return.

The amount of the understatement may be reduced, if the taxpayer can show that there was substantial authority for such tax treatment, or that the relevant facts affecting the item's tax treatment were adequately disclosed on the return or on a statement attached to the return. Sec. 6662(d)(2)(B); cf. *Schirmer v. Commissioner,* 89 T.C. 277 (1987). Section 1.6662–4(d), Income Tax Regs., defines the objective standard under which the presence of substantial authority is determined.[8]

Petitioner in this case does not fall within either exception. She received four Forms 1099–G from the FmHA showing discharge of indebtedness income of $199,701. She did not report any part of that income and did not disclose the dis-

---

[8] Sec. 1.6662–4(d)(2), Income Tax Regs., provides:

(2) Substantial authority standard. The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the "more likely than not" standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard (the standard which, if satisfied, generally will prevent imposition of the penalty under section 6662(b)(1) for negligence). A return position that is arguable, but fairly unlikely to prevail in court, satisfies the reasonable basis standard, but not the substantial authority standard. * * *

charge of indebtedness income anywhere on her return or provide any explanation of its exclusion. She did this despite the FmHA warning on the Forms 1099–G that there might be tax ramifications from the restructuring of the loans. Petitioner, similarly, has not provided substantial authority for her position that the discharge of indebtedness income need not be included in her gross income. There no doubt is such substantial authority in the insolvency exception, but respondent has conceded that portion. Petitioner has not suggested any substantial authority for failing to report the amount of the discharge of indebtedness income that exceeded her negative net worth. See *supra* note 8. Therefore, we hold that respondent's imposition of the accuracy-related penalty in this case must be sustained, but applied to the reduced amount of omitted discharge of indebtedness income ($70,312).

Based upon the foregoing,

*Decision will be entered under Rule 155.*