T.C. Memo. 1997-392


UNITED STATES TAX COURT


ESTATE OF GEORGE A. LEHMANN, DECEASED, WALTER G.
KEALY, JR. PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1282-96.                    Filed August 26, 1997.


<u>James M. Kefauver</u> and <u>Lawrence L. Bell</u>, for petitioner.

<u>Warren P. Simonsen</u> and <u>Susan T. Mosley</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAMBLEN, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's Federal estate tax in the amount of $266,970.
Petitioner is the Estate of George A. Lehmann (decedent).  The
issue for decision is whether petitioner correctly valued the

partnership interests in LKB Associates for purposes of decedent's gross estate.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

The Decedent died testate on April 1, 1992 (valuation date). Decedent resided in Montgomery County, Maryland. At the time the petition was filed, Walter G. Kealy, Jr., decedent's personal representative, resided in Gaithersburg, Maryland.

Decedent and his sister, Marie Louise Kealy, each owned, as tenants in common, one-half interest in the land located at L Street, in Washington, D.C. (property). On December 21, 1962, they agreed to lease the property for 99 years beginning as of January 1, 1963.

The lease required the lessee to construct any type of office building or commercial structure having a value of at least $500,000 in excess of the value of the land, but the agreement gave the lessee sole discretion in the design and subsequent demolition of the constructed structure during the first 69 years of the lease term. Thereafter, the lease required

the lessee to seek permission before making any structural changes. The lease also permitted the lessee to sublet the property. During 1963 and 1964, the lessee improved the property by constructing a hotel on the property.

Decedent and Marie Louise Kealy and the lessee amended the ground lease on March 29, 1963, October 28, 1963, June 2, 1964, and November 4, 1964. The ground lease included procedures for resolving any disputes arising between the landlords and the tenant, providing in pertinent part:

> 14. The Lessors and the Lessee shall each appoint a disinterested real estate appraiser not related to any of them by consanguinity or affinity and who shall have knowledge of the value of commercial real estate in Washington, D.C. Written notice of such appointments by each party shall be given to the other on or before the twentieth (20th) day following the [designated] adjustments dates of the particular year, and the two appraisers so appointed shall on or before the tenth (10th) day thereafter appoint a third appraiser of like qualifications and non-interest who shall act as their chairman.

> \* \* \* \* \* \* \*

> 18. In the event that for any reason, whether through failure to appoint appraisers, or failure of the appraisers to act, no report of the fair market value is made within the time or times, respectively, \* \* \* either party may apply to the American Arbitration Association or its successor for the appointment of an appraiser or appraisers to the end that the fair market value as contemplated by this Lease shall be determined.

> 19. In the event of a refusal or failure by the American Arbitration Association or its successor to appoint an appraiser or appraisers either party may apply to the president or senior office of the Washington Real Estate Board or its successor for the appointment of an appraiser. No appraisal shall be

invalid by reason of having been delayed or not having been made within the time or times, respectively * * *. Whenever an appraisal is so delayed, it shall be effective and binding upon the parties as to the rentals to be paid by the Lessee to the Lessors commencing on the adjustment date that a new rental basis shall begin according to the terms [of the lease]. The cost of any such appraisal made under this paragraph shall be borne and paid by the parties hereto whose neglect or default had made such appraisal necessary.

On December 19, 1983, decedent and his sister formed LKB Associates, a limited partnership organized under the laws of the District of Columbia (partnership). After forming the partnership, decedent and his sister conveyed the land subject to the 99-year lease to the partnership.

During his lifetime, decedent made gifts of partnership interests to various family members and to trusts, of which family members were beneficiaries. As of the valuation date, decedent owned a 1-percent general partnership interest and a 23.965903-percent limited partnership interest (decedent's interest). The partnership agreement granted the partners a right of first refusal, which required the selling partner to offer his or her interest to the other partners on the same terms before selling the interest to a third party. The agreement provided in pertinent part:

The interest of any Limited Partner may be assigned, transferred, sold, exchanged or otherwise disposed of ( * * * collectively referred to as "assigned") in whole or in part, and each Limited Partner shall have a right to substitute an assignee as a Limited Partner in his place and stead, without in either case the consent of the General Partners, unless

such assignment would cause a termination of the Partnership for federal income tax purposes, but any such assignment shall not relieve the assigning Partner of his obligations hereunder, unless consented to by the other Partners; provided, however, that no such assignment to a person other than a person related by blood or marriage to Marie Louise Kealy, Walter G. Kealy or George A. Lehmann shall be effective unless the interest assigned is first offered to the Partners, both collectively and individually, on the same terms and conditions for a period of ninety (90) days [hereafter referred to as right of first refusal].

The partnership agreement granted the general partners sole discretion in setting the management fee that they were entitled to receive from the partnership. Historically, the rate had been 2 percent of the partnership's gross rental income. In 1991, the general partners raised the fee from 2 percent to 5 percent of such income.

During 1983, a lawsuit was filed regarding the interpretation of certain terms of the ground lease. To resolve the dispute, the partnership and the lessee amended the terms of the lease on January 30, 1984, to provide for, inter alia, periodic rent adjustments during the life of the lease (fifth amendment). The lease and the fifth amendment directed that the rent was to be adjusted every 10 years, beginning on January 1, 1993, to an amount equal to a specified percentage per annum (rental rate) of the fair market value of the land on the first day of the 10-year period as if the land were not encumbered by the lease (unencumbered land).

The fifth amendment specified that the rental rates for the periods from January 1, 1993, through December 31, 1998, and from January 1, 1999, through December 31, 2012, were 5.44 percent and 6.4 percent, respectively. Thereafter, the partnership and the lessee were to negotiate the rental rate for each 10-year period beginning on January 1, 2013, through the end of the lease, but in any event the negotiated rate was not to be less than 6.4 percent or more than 7.7 percent. The fifth amendment also required the partnership and the lessee to set the fair market value of the unencumbered land as of the first day of the 10-year period (adjustment date).

The fifth amendment added additional procedures for resolving disputes, providing in pertinent part:

> If the parties are unable to agree on the * * * Rental rate to be applicable in the following period prior to any decennial rent adjustment date from and after January 1, 2013, the appropriate [p]ercentage (not less than 6.4% or more than 7.7%) shall be determined by appraisers appointed to determine such * * * Rental rate consistent with the procedure for determining the fair market value of the unimproved land under the [ground lease].

As of the valuation date, the principal assets of the partnership were the leased fee interest in the property and a cash balance of $64,339. In addition, as of that date, the lessee maintained a 99-room hotel with an occupancy rate of 65 percent.

In connection with the preparation of the estate tax return, petitioner obtained a valuation of decedent's interest from P.

Richard Zitelman of the Zitelman Group, Inc. Zitelman determined that, as of the valuation date, the fair market value of decedent's interest was $399,000. Petitioner included this amount in the gross estate. Respondent determined the fair market value of the decedent's interest as of the date of death was $1,070,000. Subsequently, respondent conceded $262,000 of that adjustment.

OPINION

We must decide whether petitioner properly valued decedent's interest in the partnership for purposes of section 2031(a). Petitioner must prove that respondent's determination of value set forth in the notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987).

The parties agree that decedent's interest should be valued as a limited partnership interest notwithstanding the fact that decedent held a 1-percent general partnership interest as of the valuation date but do not agree upon the value of that interest or upon the method by which decedent's interest should be valued. Respondent's expert used the fractional discount method, whereas petitioner's expert used the discounted cash-flow (DCF) method.

The parties primarily rely upon their experts' testimony and reports to support their respective positions. Expert testimony sometimes aids the Court in determining valuation. Other times, it does not. See Laureys v. Commissioner, 92 T.C. 101, 129

(1989).  We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985).  We are not bound, however, by the opinion of any expert witness when that opinion is contrary to our judgment.  Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561.  Although we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we also may be selective in the use of any portion of such an opinion, Parker v. Commissioner, supra at 562.  Consequently, we will take into account expert opinion testimony to the extent that it aids us in arriving at the fair market value of the property.

The value of decedent's gross estate is the fair market value of property includable in the gross estate.  Sec. 2031. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Newhouse v. Commissioner, supra at 217; sec. 20.2031-1(b), Estate Tax Regs. Because valuation is necessarily an approximation, the figure at which the Court arrives need not be one as to which there is

specific testimony, if it is within the range of figures that may properly be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

The willing buyer-willing seller standard generally is used in valuing transferred property. United States v. Cartwright, supra. The standard is an objective test using hypothetical buyers and sellers in the marketplace, and is not a personalized one which envisions a particular buyer and seller. Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982); Kolom v. Commissioner, 71 T.C. 235, 244 (1978), affd. 644 F.2d 1282 (9th Cir. 1981). Generally, for estate tax purposes, property is valued at its fair market value based on its highest and best use. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs.

A.   Respondent's Expert

Respondent relies upon the report and testimony of an expert, Richard L. Parli. Parli is a certified general real property appraiser.

Parli considered two methods of estimating the value of decedent's partial interest in the partnership:  (1) The income discounting method and (2) the fractional discounting method. Ultimately, Parli concluded that the fractional discounting method was the appropriate method because, in his view, land is not inherently income producing.

Parli first determined the present value of the rents due pursuant to the terms of the ground lease and from the partnership's reversionary interest in the land and then calculated decedent's pro rata share of those amounts. Under Parli's calculations, the present value and decedent's pro rata share were $4,680,000 and $1,154,043, respectively.

Parli next considered factors affecting the value of decedent's pro rata share including, inter alia: (1) Relative risk of the partnership's assets; (2) historical consistency of the partnership's earnings; (3) condition of the partnership's assets; (4) market growth potential; (5) portfolio diversification; (6) strength of management; (7) size of decedent's interest; (8) liquidity; (9) potential ability to influence management and (10) relative ease of analyzing the partnership's assets. Parli assigned individual discounts for each factor and calculated an aggregate discount factor of 30 percent. Based upon such a discount factor, he assigned a value to decedent's interest of $808,000.

B. Petitioner's Expert

Petitioner relies upon the report and testimony of its expert, P. Richard Zitelman. Zitelman is the president of The Zitelman Group, a firm providing investment advisory and investment services.

Zitelman also considered two methods of evaluating the fair market value of decedent's interest: (1) The liquidation method,

and (2) the DCF method.  Ultimately, Zitelman selected the DCF method because, in his view, a "potential buyer" of decedent's interest would be an individual or entity seeking long-term cash-flows but having no expectation of receiving the return of its invested capital.

Under the DCF method, Zitelman estimated the fair market value of decedent's interest by calculating the present value of decedent's pro rata share of the partnership's expected net cash-flows.  He calculated the net income due pursuant to the lease and the net reversionary interest in the land.

For purposes of calculating the annual rent, Zitelman assumed that the fair market value of the unencumbered land, as of the valuation date and as of January 1, 1993, was $5,479,883. Thereafter, Zitelman assumed the value increased annually at a rate of 2.6 percent.  He also assumed the rental rate for the lease period of January 1, 2013, through March 31, 2062, was 7.05 percent.

In estimating all of the expenses for 1992 except for the management fees and the franchise tax, Zitelman averaged the deductions reported upon the partnership's Federal income tax returns for taxable years 1989 through 1991.  See appendix A. Thereafter, he treated the expenses as increasing at a rate of 2.6 percent per year.

Zitelman estimated the management fee as equal to 5 percent of the gross rental income and the franchise tax expense as equal

to the product of the estimated net income and the tax rates in effect as of the valuation date.

Zitelman made several assumptions regarding the rate of return a hypothetical buyer would demand. He initially noted that, as of the valuation date, the rate of return of 30-year Treasury bonds was 7.9 percent and assumed that the applicable discount rate would have to be at least between 9.9 percent and 11.9 percent. Zitelman assumed that the discount rate necessary to achieve an acceptable rate of return required that such a discount rate should be increased for each of the following perceived risks: (1) The partnership agreement permits the general partners to make loans at (a) the prime rate to the partners for estate taxes, estate administrative expenses, and medical expenses or (b) the rate at which petitioner borrowed the funds; (2) there is a likelihood of a disagreement between the lessee and the partnership as to the future rental rates or the value of the property; (3) a potential buyer would have to invest substantial time, energy, aggravation, and cost to evaluate decedent's interest; (4) the partnership agreement granted the other partners a right of first refusal; and (5) the potential buyer did not have control over the partnership's management. Zitelman concluded that a hypothetical buyer would demand a purchase price based upon a discount rate between 15.3 percent and 22.6 percent. Ultimately, Zitelman averaged the present values calculated based upon these rates and assigned a fair

market value to decedent's interest in the partnership of $399,000.

The divergent methodologies of the experts that testified in this case reveal that the determination of the value of a minority interest in a partnership holding real estate is a matter of judgment to be resolved on the basis of the entire record. See Estate of Lauder v. Commissioner, T.C. Memo. 1994-527. Parli failed to explain adequately how he derived the individual discounts. Rather, Parli summarily concluded that each individual discount is "typical" without providing any evidence, e.g., comparables or market data, establishing the basis of these conclusions. Giving due consideration to each of the expert reports, and weighing all of the facts and circumstances presented, we conclude that Zitelman's methodology provides the most reliable basis for valuing the decedent's interest as of the valuation date. The value of any interest in real property that has an income stream can be estimated by the DCF method. See Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; Estate of Hatchett v. Commissioner, T.C. Memo. 1989-637. The evidence before the Court shows that the property had a determinable income stream.

Respondent concedes that the DCF method is an appropriate appraisal method in some contexts but argues that, based upon Parli's testimony, the method is not appropriate when the current use of the property is not its highest and best use. Respondent

relies upon Parli's view that the highest and best use of the property is as office space rather than as a hotel.[1]

Respondent's contention ignores the fact that the property was encumbered by a long-term lease. The lessee, possessing a leasehold interest, occupies the land on which its particular hotel is located. Such an interest reduces the value of the partnership's interest in the land because the lessee's contractual right to occupy the land prevents the partnership from re-leasing the property at a higher rate or from demolishing the hotel and using the land for another, perhaps more profitable, purpose. The lessee, not the partnership, has the option to use the land to construct an office building or to sublet the property at a profit. Consequently, it is unrealistic to contend that the value of the partnership's interest in the land is equivalent to the value of the land at its highest and best use as though the land were vacant. See Marks v. Commissioner, T.C. Memo. 1985-179; Appraisal Institute, The Appraisal of Real Estate, 280 n.5, 282 (10th ed. 1992). Respondent's assertions fail to consider reality as it existed on

---

[1]Petitioner does not argue that it made an election pursuant to sec. 2032A. Sec. 2032A permits an estate to elect to value qualified real property used for farming and small business purposes on the basis of income capitalization rather than on the basis of highest and best use. Sec. 2032A(e)(7); Williamson v. Commissioner, 93 T.C. 242, 244 (1989), affd. 974 F.2d 1525 (9th Cir. 1992); Estate of Heffley v. Commissioner, 89 T.C. 265, 271 (1987), affd. 884 F.2d 279 (7th Cir. 1989).

the valuation date.  We are satisfied that the DCF method is a viable means of determining the value of decedent's interest.

Although we accept that the DCF method is an appropriate approach in the instant case, we have found weaknesses in Zitelman's analysis.  The DCF method generally requires assumptions regarding the future revenue, operating costs, and trends, see generally Estate of Cartwright v. Commissioner, T.C. Memo. 1996-286, but some of Zitelman's assumptions are unreasonable.

We are not convinced that the perceived risks cited by Zitelman would depress the hypothetical purchase price as significantly as petitioner would have us believe.  Zitelman correctly notes that the partnership agreement permits the general partners to lend money to the estate of a deceased partner, and obviously, in making such loans, the general partners would be motivated in part by their family ties to the deceased partner, but the partnership agreement also provides that the deceased partner's interest in the partnership must secure such a loan, and the loan must be at the prime rate or the rate at which the partnership borrows the funds.  Accordingly, we do not see such lending as particularly jeopardizing the partnership's cash-flow.

Nor do we find that the risk of future litigation over determining the rental rates or the fair market values of the unencumbered land substantially affected decedent's potential

share of the cash-flows. To a large extent, the ground lease and the amendments eliminated these risks by setting forth a mechanism for settling such disputes through the use of appraisers.

Similarly, we disagree with Zitelman's view that the hypothetical buyer would demand a higher rate of return because of the "substantial amount of time, energy, aggravation, and cost" required to value decedent's interest. Although such an interest is not as easy to value as other investments, such as a 30-year Treasury bond or annuity, the present value of the cash-flows is, nevertheless, not so difficult or inconvenient to calculate as to justify a significant increase in such a rate of return. The partnership principally owns only one income-producing asset. Zitelman's own analysis evidences the relative ease by which decedent's interest may be valued.

We are not convinced that the right of first refusal significantly affected the value of decedent's interest. The partnership agreement does not provide a price or a formula for determining the fair market value of a transferred partnership interest. The absence of a fixed price clearly has a less dramatic effect than fixed-price restrictions, see, e.g., Worcester County Trust Co. v. Commissioner, 134 F.2d 578, 581-582 (1st Cir. 1943), revg. Estate of Smith v. Commissioner, 46 B.T.A. 337 (1942); Estate of Reynolds v. Commissioner, 55 T.C. 172, 188-190 (1970); Mandelbaum v. Commissioner, T.C. Memo. 1995-255,

affd. without published opinion 91 F.3d 124 (1996).  Indeed, a right of first refusal without a fixed price does not limit the buyers to whom a seller could sell the interest or the price for the interest, but merely governs the order in which prospective buyers must stand in line to purchase.  Mandelbaum v. Commissioner, supra.  Given the fact that such a right actually protects and benefits the other partners, the depressant effect (if any) upon the value of a privately held partnership interest subject to a right of first refusal is not necessarily substantial.

Overall, from our perspective, Zitelman's report lacks a wholly objective analysis of the willing buyer/willing seller standard.  Consequently, we do not find the report as compelling as petitioner suggests.  Rather, Zitelman focuses exclusively upon the hypothetical willing buyer.  Zitelman failed to consider whether a hypothetical seller would sell his or her interest in the partnership for $399,000.  The test of fair market value rests upon the concept of a hypothetical willing buyer and a hypothetical willing seller.  We find incredible the proposition that any partner, limited or general, would be willing to sell his or her interest for such a low amount as to generate an internal rate of return of approximately 15 percent to 22 percent.  Ignoring the views of a willing seller is contrary to this well-established rule.  Id.  In this regard, Zitelman's

failure to consider a hypothetical willing seller of an interest in the partnership weakens his analysis.

Zitelman's assertion at trial that the fact the lessee is not a major hotel chain also depresses the value and accordingly increases the discount rates lacks merit. In light of the lessee's other options for developing the property, we do not see the financial success or lack thereof in the hotel business as a significant risk.

Zitelman's calculations are also inaccurate. First, we found several errors in the calculations of the partnership's rental income. Zitelman ignored the appreciation in the fair market value of the unencumbered land between the valuation date and January 1, 1993, for purposes of calculating the expected rent due. Zitelman claimed to be treating the fair market value of the unencumbered land as appreciating at a rate of 2.6 percent per year, yet he estimated the value of that land, as of the valuation date, to be $5,479,883 and used that amount without adjustment for estimating the rental income for the period of January 1, 1993, through December 31, 2002. Moreover, Zitelman calculated the net cash-flow to be received during the period after decedent's death through December 31, 1992, but he failed to include any part of that cash-flow in the total values assigned to decedent's interest. See appendix B. In addition, Zitelman treated the net cash-flows arising from the lease as being received upon the last day of the year. The lease

agreement, however, specifically provides that the lessee is to pay the rent on the first of each month. Further, the partnership had a cash balance of $64,339 as of the valuation date. Zitelman's analysis does not provide adequate support or explanation of treatment of that cash or his assumptions regarding the projected interest income.

Second, we find Zitelman's estimate of the expected expenses is likewise flawed. For example, Zitelman assumed that the management fees equal 5 percent of the gross rentals each year. These fees, however, are subject to the discretion of the general partners. We see no reason to assume that the fee will always be 5 percent rather than 2 percent, as it was in taxable years 1989 and 1990. Zitelman included expense amounts and reductions in the expected cash-flows for which he offered no explanation. We have disregarded those amounts. Zitelman's calculation of the franchise taxes appears to be too low, but the record does not provide adequate information by which to recalculate those amounts.

Finally, Zitelman estimated the liquidation costs at the end of the lease term in 2062. We find these amounts to be too speculative, conjectural, and remote. See Estate of Bennett v. Commissioner, T.C. Memo. 1993-34.

Despite our concerns, Zitelman's analysis makes several valid conclusions. With the weaknesses discussed above in mind, we have estimated the value of decedent's interest by modifying

Zitelman's analysis.  See appendices C and D.  Under our calculation, we conclude that the value of decedent's interest, as of the valuation date, was $699,853.  We have considered all of the other arguments made by the parties and, to the extent we have not addressed them, find them to be without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

[REPORTER'S NOTE:  THE APPENDICES IN LOTUS FORMAT HAVE NOT BEEN REPRODUCED.]